STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. LIONEL A. WEST, DEFENDANT-APPELLANT.

Argued January 19 and 20, 1959—Decided March 10, 1959.

328

*Mr. Frank G. Schlosser* argued the cause for defendant-appellant.

*Mr. Frank J. V. Gimino,* Assistant Hudson County Prosecutor, argued the cause for plaintiff-respondent (*Mr. Lawrence A. Whipple,* Hudson County Prosecutor, attorney; *Mr. Frank J. V. Gimino,* Assistant Hudson County Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendant was convicted of a misdemeanor under *R. S.* 49:1–4 and 25 of the New Jersey Securities Law. We certified his appeal on our motion while it was pending in the Appellate Division.

The indictment ran against defendant West, Richard J. Hannaway, and his wife Marion C. Judd Hannaway. West alone was brought to trial.

The charge grew out of the sale to Mrs. Rose Werner of shares of stock of American General Oil & Gas Company (herein called American General), a Delaware corporation. Defendant, who operated under the name of West and Company in Jersey City, was the underwriter of the stock issue. The prospectus stated that 800,000 shares were offered for public sale at 12½ cents per share. Defendant sold 125,000 shares at that price to Mrs. Werner through his general manager, Hannaway. Hannaway thereafter persuaded Mrs.

Werner to return the shares on the plea that the authorized public issue had been oversold. According to her, she was promised 67½ cents per share. She testified that after she pressed defendant for payment, he and Hannaway induced her to accept 125,000 shares of American General in discharge of the obligation upon the representation that these shares were as good as the shares she had returned. The substituted shares were delivered to her on January 28, 1952, and the alleged illegal practice relates to that transaction.

The shares originally sold to Mrs. Werner were part of the 800,000 shares authorized for public sale. Those she accepted in return were part of 1,500,000 shares issued to Robert C. Jones, president of American General. The prospectus stated that Jones would hold these shares (referred to as "founders' stock") for investment and not for distribution. They were not registered for public sale or exempt from registration, and hence their distribution by public sale would violate the Securities Act of 1933. 15 *U. S. C. A.,* § *77e.*

Some of the shares here involved were endorsed in blank by Jones and the remainder were so endorsed by Marion C. Judd, who in fact was Mrs. Hannaway. We need not recount the story of the intermediate transaction between Jones and Mrs. Hannaway. It is sufficient to say that the representative of the transfer agent of American General testified that if the shares had been presented (Mrs. Werner in fact retained them in the form received), transfer would have been refused unless counsel for American General gave an opinion that the transfer was proper or a court directed it.

The illegal practice alleged in the indictment was defendant's representation that the shares were marketable and negotiable, and his concealment of the fact that they were founders' stock, not to be sold to the public without prior registration. The evidence in support of the affirmative misrepresentation was Mrs. Werner's testimony that defendant assured her that the substituted shares were as good as the ones originally sold to her.

## I.

 Defendant urges he was entitled to an acquittal as a matter of law. This contention revolves about the allegation that the shares were not marketable or negotiable. He argues correctly that despite the penalties which may be experienced by those who publicly sell unregistered shares, Mrs. Werner, being innocent of the tainting facts, acquired good title. See *A. C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 *U. S.* 38, 61 *S. Ct.* 414, 85 *L. Ed.* 500 (1941). Hence, he says, the shares were fully marketable and negotiable by her. The indictment was quite inartistically drawn, but its fair meaning was not that Mrs. Werner's title was defeasible but rather that the shares were not marketable or negotiable in the market place sense, in that their transfer was subject to the block we have described and hence, had Mrs. Werner sought to sell, she would have experienced a delay or perhaps a law suit, with the possibility of dollar loss in a falling market. Thus the shares were not as good as the original shares, contrary to defendant's alleged statement. The evidence would support a jury finding upon the State's thesis. The trial court properly refused to order an acquittal.

## II.

 Defendant next claims a failure to prove that the crime was committed in Jersey City as alleged in the indictment. The pertinent facts are that the representation was made in a telephone conversation between defendant in Jersey City and Mrs. Werner in New York City and that the shares were physically delivered to her by Hannaway in the latter city.

Summarized for the immediate purpose, the indictment alleged that defendant and the Hannaways on January 28, 1952 "in the City of Jersey City" employed fraud, deception and concealment "in connection with the issuance and sale to and the purchase thereof by one Rose B. Werner" of the 125,000 shares, in that they concealed and misrepre-

sented material facts concerning the shares "then and there purchased" by Mrs. Werner.

Defendant urges the sale occurred in New York City, rather than in Jersey City. We need not consider whether a contract to sell would satisfy the words "sale" and "purchase" as used in the indictment, or decide where a contract to sell comes into being when it is made in an interstate telephone conversation. Neither question is involved because the essence of the charge is the illegal practice, whether or not a sale resulted here or elsewhere.

*R. S.* 49:1–4 reads:

"The use or employment by a person, partnership, corporation, company, trust or association, of any deception, misrepresentation, concealment, suppression, fraud, false pretense, false promise or fictitious or pretended purchase or sale, in connection with the issuance, sale, *offer for sale*, purchase, offer to purchase, promotion, negotiation, advertisement or distribution *within or from this state* of any securities, are hereby declared to be illegal practices and are hereby prohibited." (Emphasis added)

The sweep of the statute is apparent. For present purposes, we note that an illegal practice "in connection with the * * * offer for sale" is proscribed. Hence it is of no moment whether a contract was made or title passed. Nor is it material whether the illegal practice hit the intended mark in this State or elsewhere. The legislative history sustains the clear reading of the statute. Initially illegal practices "within this state" were prohibited. By *chapter* 52 of the *Laws of* 1930 the quoted phrase was amended to read "within or from this State," and the title was amended agreeably by *chapter* 226 of the *Laws of* 1931. The 1930 amendment was intended "to prevent this state from being used as a base of operations for crooks marauding outside the state." *Stevens v. Wrigley Pharmaceutical Co.,* 9 *N. J. Misc.* 385, 386 (*Ch.* 1931) ; see *Stevens v. Home Brewery, Inc.,* 112 *N. J. Eq.* 513, 516 (*Ch.* 1933). Hence it is enough if the fraudulent practice originated in New Jersey in an interstate telephone conversation. There of course is no constitutional reason why a state may not prohibit offen-

sive conduct within its borders even though an impact elsewhere is intended. *Cf. State v. Western Union Telegraph Co.,* 12 *N. J.* 468, 489–490 (1953), appeal dismissed 346 *U. S.* 869, 74 *S. Ct.* 124, 98 *L. Ed.* 379 (1953); *Ziffrin, Inc. v. Reeves,* 308 *U. S.* 132, 60 *S. Ct.* 163, 84 *L. Ed.* 128 (1939); *People v. Zayas,* 217 *N. Y.* 78, 111 *N. E.* 465 (*Ct. App.* 1916); *Restatement, Conflict of Laws* (1934), §§ 64, 65, at *pp.* 97–98.

Thus the gravamen of the charge before us was the illegal practice in connection with an offer to sell. The allegation of an actual sale was appropriate but unnecessary, and whether the sale occurred here or in New York was immaterial. The failure to prove an allegation which is unnecessary or immaterial is not fatal to the result. *Cf. State v. Kohler,* 40 *N. J. Super.* 600, 604 (*App. Div.* 1956), certification denied 22 *N. J.* 225 (1956); *State v. Lamoreaux,* 13 *N. J. Super.* 99, 103 (*App. Div.* 1951).

### III.

■ The next question is whether the court properly admitted proof of the disposition made of the original shares returned by Mrs. Werner. The challenged evidence was designed to show that those shares, or some of them, were sold to the credit of fictitious persons and the proceeds kept by West alone or by him and Hannaway. Since the illegal practice charged in the indictment related to the shares later sold to Mrs. Werner, defendant says the proof was irrelevant.

Defendant conceded that the original shares were sold by his company. He however asserted that Hannaway was acting solely on his own and not for West and Company in obtaining their return and delivering the substituted shares. Mrs. Werner claimed that in the interval she had demanded satisfaction from defendant of Hannaway's promise that she would receive 67½ cents per share, and that defendant gave assurances that the obligation would be honored. Defendant denied these conversations and also the critical

representation that the substituted shares were as good as the original ones. In these circumstances the challenged proof was material, for it tended to show his liability to Mrs. Werner in connection with the return of the original shares, his interest in discharging that obligation, and a motive for the illegal practice alleged. It thus corroborated the direct proof of the offense. That evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof. The unwholesome aspects, authored by defendant himself, if the evidence be believed, were inextricably entwined with the material facts.

## IV.

The judgment, however, must be reversed because of a number of prejudicial errors which in their aggregate permit no other course. *State v. Orecchio,* 16 *N. J.* 125 (1954).

## A.

[4] The State offered Louis A. Cohen, Esq., who at the time of the events here involved was a Deputy Attorney General of the State in charge of the Securities Fraud Department. The State elicited over objection that Mr. Cohen conducted an investigation of West and Company, filed a civil complaint charging illegal practices in a number of matters including the Werner transaction, and obtained an injunction and the appointment of a receiver. The jury was thus told that illegal practices had been adjudged not only with respect to the very matter before them but as well with respect to other situations. It need hardly be said that such proof was incompetent and prejudicial. 20 *Am. Jur., Evidence,* § 1012, *p.* 856; 14 *Am. Jur., Criminal Law,* § 186, *p.* 895; *Annotation,* 87 *A. L. R.* 1258 (1933); *State v. Sharkey,* 73 *N. J. L.* 491 (*Sup. Ct.* 1906).

The State's thesis was that this evidence was merely preliminary to proof that defendant violated the restraining order by entering a bank vault, from which a jury could infer consciousness of guilt. The claimed inference would

be far-fetched. There was no proof that the visit related to the immediate matter. The circumstances were not given in any detail, and we gather from the argument of counsel that the contempt charge was never adjudged. We cannot escape the conclusion that if the purpose of the State was not to achieve the prejudicial impact of the civil judgment upon the main issue in the criminal cause, such was in reality its sole role. In any event, had the proof with reference to the alleged contempt been more explicit and susceptible of the inference asserted, still "the minute peg of relevancy" would have been so grossly obscured by the incompetent and damaging nature of the preliminary matter that the testimony should have been excluded upon a proper exercise of discretion. *State v. Bucanis,* 26 *N. J.* 45, 53 (1958), *certiorari* denied 357 *U. S.* 910, 78 *S. Ct.* 1157, 2 *L. Ed. 2d* 1160 (1958). The possible probative value of the incident was plainly outweighed by the substantial danger of undue prejudice. See *Model Code of Evidence* (1942), rule 303; *Uniform Rules of Evidence* (1953), rule 45, annotated in *Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey* (1955), *p.* 93.

In passing we should comment upon another phase of the testimony of Mr. Cohen. He was offered as an expert with respect to stock transactions and the impact of the block against transfer of the shares upon their sale in the market place. Over objection the State elicited his opinion upon the unparticularized basis of the investigation he conducted. The opinion of an expert must rest upon facts spread upon the record. If the expert has competent factual knowledge upon which his opinion reposes, it should first be adduced. *Stanley Co. of America v. Hercules Powder Co.,* 16 *N. J.* 295, 305 (1954). There was no prejudice here since the facts ultimately relied upon by the witness were otherwise proved, but the vice of the State's approach was that it invited cross-examination with respect to sundry matters in the file of the Attorney General relating to an evaluation of defendant's guilt. Thus the trial was un-

necessarily prolonged, albeit a point was reached at which the trial court stopped the inquiry.

### B.

Upon cross-examination of defendant, the prosecutor embarked upon avenues of interrogation which were plainly improper.

■ Whether the original shares were worth 12½ cents was not an issue, nor was the ultimate fate of American General. During the trial the prosecutor had stated, improperly, that American General was no longer in business. This prompted defendant on cross-examination to volunteer a denial of the prosecutor's statement, coupled with an assertion that the company had merged with another. The prosecutor seized upon defendant's denial to embark upon cross-examination which obviously was designed to show that the company was a flimsy operation from the outset and to impugn defendant's role as underwriter. For example, the prosecutor inquired whether it was not true that after defendant sold $100,000 worth of shares, the bank balance of American General was but $30.16. The prosecutor thus deliberately injected into the case considerations irrelevant to the indictment.

The prosecutor further elicited on cross-examination that defendant had changed his name (accomplished judicially some 35 or 40 years ago), that he drove a Lincoln automobile at the time of his operations, and the amount of rent he paid for his New York apartment. The record reads:

"Q. When did you work for Tellier? A. No. I did not."

The significance of the question (for which the prosecutor presumably had no factual warrant in any event) was that at the time of the trial, as revealed by the argument of counsel, there was considerable publicity with respect to alleged fraudulent stock operations of one Tellier at the very seat of the trial. The suggestion to the jury was quite blunt. At another point in the trial, the prosecutor

stated with aggravating effect that whenever he puts a question on cross-examination he has facts to support its implication. The interrogation, sought vaguely to be described as an inquiry concerning credibility, was improper.

The trial got out of hand. The performance of counsel (neither is of record on this appeal) is regrettable. Counsel for defendant contributed to some extent by his failure to accept the trial court's rulings, by verbose argumentation, by tedious· repetition especially on cross-examination, and by joining the prosecutor in exhibitions of vocal power. But the prime offender was the prosecutor, who throughout the trial assailed his adversary with nasty personalities and insinuations. It would serve no purpose to record the many incidents. The trial court repeatedly admonished both counsel and felt obliged on several occasions to apologize to the jury for their behavior. He warned of the presence of the contempt power. The flavor of the trial is reflected in two brief quotations from remarks of the court:

"Gentlemen, is this a barroom brawl or are you attorneys addressing a Court?"

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"It is a most disgraceful demonstration. I doubt whether any other court in the United States would have the carrying on and the conduct that has been going on in this trial."

Justice cannot be assured in a climate of that kind.

[6] We have repeatedly stressed the obligation of a prosecutor to seek a fair trial. *State v. D'Ippolito*, 19 *N. J.* 540, 547–550 (1955); *State v. Landeros*, 20 *N. J.* 69, 74 (1955), *certiorari* denied 351 *U. S.* 966, 76 *S. Ct.* 1025, 100 *L. Ed.* 1486 (1956); *State v. Johnson*, 28 *N. J.* 133, 142–143 (1958). He is not an ordinary adversary; he represents the State whose interest is served by an untainted judgment firmly rooted in facts alone. There is no room for unfair advantage, clever or bald. He may parry impropriety by the defense and seek the ruling of the trial court to eradicate it, but he may not retaliate with improprieties of his own. His mission is a verdict that will stand. Any other course is just wasteful of public funds and the time and

energies of all concerned. It is gratifying that prosecutors generally abide by this standard. Unhappily the failure in this case was pronounced.

The judgment is accordingly reversed and the cause remanded for retrial.

HEHER, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS and FRANCIS—5.

*For affirmance*—None.