242 N.J. Super. 601 (1990)
577 A.2d 1282
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GREGORY FROST, A/K/A ABDUR SHARIF, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted March 20, 1990.
Decided July 16, 1990.
*605 Before Judges MICHELS, DEIGHAN and COHEN.
Thomas S. Smith, Jr., Acting Public Defender, attorney for appellant (Ann L. Kazanchy, Designated Counsel, of Counsel, on the brief).
Robert J. Del Tufo, Attorney General, attorney for respondent (Mildred Vallerini Spiller, Deputy attorney General, of Counsel, on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
One issue on this appeal is the admissibility of "battered woman syndrome" evidence to bolster a victim's credibility in the prosecution of a defendant on an assault charge where the prosecutor sought to use a series of prior assaults on the victim and reconciliations over a period of time. We hold that such evidence is admissible as part of the State's case in chief.
*606 Defendant Gregory Frost, a/k/a Abdur Sharif, was convicted by a jury of fourth-degree contempt of court, in violation of N.J.S.A. 2C:29-9 (count one); fourth-degree unlawful possession of a weapon, in violation of N.J.S.A. 2C:39-5d (count two); third-degree possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4d (count three); third-degree burglary, in violation of N.J.S.A. 2C:18-2 (count four); simple assault, in violation of N.J.S.A. 2C:12-1a(1), a lesser-included offense of second-degree aggravated assault, in violation of N.J.S.A. 2C:12-1b(1) (count five); first-degree aggravated sexual assault, in violation of N.J.S.A. 2C:14-2a(3) and (4) (count six), and third-degree aggravated criminal sexual contact, in violation of N.J.S.A. 2C:14-3a (count seven).
At sentencing, the judge merged the second count into the third, and the seventh count into the sixth. He then imposed an eighteen-month sentence on count one, a consecutive five-year sentence with two and one-half years of parole ineligibility on count three, another consecutive five-year sentence with two and one-half years of parole ineligibility on count four, a concurrent six-month sentence on count five, and a consecutive twenty-year sentence with a ten-year parole disqualifier on count six, for an aggregate sentence of 31 1/2 years with 15 years of parole ineligibility. The total sentence was consecutive to any sentence defendant was currently serving for parole violation. A $150 Violent Crimes Compensation Board penalty was also imposed.
The following facts were developed at trial. On April 3, 1986, L.S. had been romantically involved with defendant for about three and one-half years, and had a child, R.S., seven months old, by defendant. She had lived with defendant on and off in different places, but on that date, she was living in an apartment in Ocean Township with her baby and her mother, D.S.
At approximately 7:30 that morning, L.S. was awakened by defendant tapping her on the shoulder. He started to holler at *607 her and hit her. The baby began to cry so L.S. grabbed the child and ran to the front door as defendant ransacked her bedroom. When L.S. could not get the front door open, defendant approached her wielding a box cutter with a razor in it, and cut her arm.
L.S. testified that they talked and she suggested they go to the bedroom and have sex. L.S. claimed that the reason she suggested sex to defendant that morning was because she knew "that would calm him down." They then went to L.S.'s mother's place of employment in Red Bank to get keys for her mother's car. L.S.'s mother testified that L.S. was disheveled, seemed dazed, shocked and trembly. She also noticed a deep cut on L.S.'s left arm.
L.S. told her mother that defendant was "out" (released from prison) and that he had cut her with a razor. Her mother knew that defendant had been in jail, that L.S. was the one who had been responsible for his arrest (on unrelated theft charges), and that defendant was angry about it. Her mother described her daughter's relationship with defendant as a violent one. She gave L.S. the car keys. L.S. asked her mother not to call the police, stating that everything would be all right.
L.S. was treated at the hospital emergency room. Because she thought everything was going to "be all right," she told the doctor that she had cut her arm on the refrigerator. Dr. William Scrabogna testified that L.S. had a deep laceration on her upper left arm which required four sutures underneath the skin and an additional 11 stitches to close the skin.
After L.S. was treated at the hospital, she, defendant and the baby went to defendant's mother's house to get money. They then went to a park, drank beer and talked. L.S. thought that everything was going to be fine and figured that she would just do what defendant wanted. Eventually, they went back to L.S.'s apartment, where she called her mother at about 3 p.m. and told her that she would pick her up from work. However, L.S. never picked her mother up and at approximately 6:30 p.m., *608 her mother found another ride home. When her mother entered the apartment, she and L.S. got into a heated argument. Apparently, an upstairs neighbor called the police.
At approximately 7 p.m., Detectives Kenneth Kennedy and Lance Rowland of the Ocean Township Police Department responded to the call of a domestic dispute. They waited outside the apartment while other officers went inside. Just as an officer inside reported everything as calm, Kennedy and Rowland heard leaves rustling outside the apartment and saw defendant running from the apartment with no shirt, shoes or socks. They chased him for about one-quarter of a mile. When they caught him, they recognized him to be defendant and arrested him for violating a restraining order which was issued on March 10, 1986, enjoining defendant from returning to L.S.'s apartment and from contacting her.
Over defendant's objection, L.S., her mother and police testified to prior violent acts which defendant committed upon L.S.. For example, L.S. testified that she had gotten a restraining order against defendant because of fights and because they were no longer able to get along. L.S. had known defendant for only two days when he first hit her. On an average he hit her at least once a month. Sometimes L.S. called the police when she was hit.
D.S. confirmed the violence between L.S. and defendant, claiming that she, herself, had moved to Ocean Township from Red Bank to get away from defendant. D.S. also called the police five or six times when defendant refused to leave her premises. According to Detective Rowland, the police had been called to D.S.'s apartment in Ocean Township approximately nine times, due to disputes involving defendant.
After the police took defendant into custody, Detectives Kennedy and Rowland returned to D.S.'s apartment to take L.S.'s statement. She was very nervous, upset, emotional and crying. She told the police what had happened that day and *609 went to police headquarters to give a more complete written statement.
After L.S. gave her statement, Det. Rowland signed out a complaint against defendant. As defendant was being booked and processed, he asked the officer to tell him with what he was being charged. When Rowland told him, defendant's somewhat cocky response was, "She'll drop the charges." When Rowland told defendant that he, the officer, had signed the complaint and that the normal procedures would be carried through, defendant's attitude changed.
It was stipulated that after defendant was taken into custody, L.S. went to visit him in jail on at least 11 occasions. According to L.S., she took her son so that defendant could visit with him.
Defendant testified on his own behalf. Even though he had been in jail from March 16 to April 2, 1986, he claimed he was not angry at L.S. or her mother who were responsible for him being in jail. He claimed that L.S. had let him in the apartment on the morning of April 3. They started arguing about other women and, as L.S. tried to get away from defendant's embraces, she cut herself on a metal strip above the refrigerator handle. L.S. asked defendant to take her to the park for the day. Defendant first took her to the hospital and then got some beer before going to the park. They returned to the apartment at about 6:45 p.m. Defendant came inside the apartment at L.S.'s urging. When he heard the police come, he jumped out the window because he just found out that the restraining order had not yet been lifted. He claimed that L.S. had gotten the restraining order because she had been upset with him for coming home late.
Defendant admitted that he argued and had physical fights with L.S. in the past, but claimed that they were not really violent in nature. He admitted that L.S. had called the police on about seven or eight occasions over the course of their three and one-half-year relationship. He denied ever asking or persuading *610 her to drop any charges. Defendant also denied that he hit L.S. or threatened to hit her on the day in question. He did admit to searching her pocketbook and her dresser drawers, looking for phone numbers of people she might have been "messing with." He claimed that the screen in the bedroom had been slit earlier in the day when L.S. locked herself out of the apartment and climbed back in to get the baby's carriage.
On appeal, defendant raises the following issues:
I The admissibility and use of "battered woman syndrome" evidence in this type of case was inappropriate and, therefore, a reversible error.
II Even if [State v.] Kelly [97 N.J. 178, 478 A.2d 364 (1984)] is applicable here, expert's qualifications were severely lacking. It was an abuse of judicial discretion allowing her to testify, constituting reversible error.
III The court erred by permitting the "expert" to testify on the basis of a mere 50-minute interview with the victim.
IV The trial court erred in ruling the defendant's prior convictions to be admissible to attack credibility.
V The trial court erred in admitting the hearsay of Det. Rowland under the "fresh complaint" exception.
VI The trial court abused its discretion in permitting the introduction into evidence of testimony concerning "prior bad acts" of the defendant.
VII In sentencing, the court improperly relied upon an aggravating factor which was not present for it to be considered in meting out the sentence.

I
In his first point, defendant argues that the use of "battered woman syndrome" evidence was inappropriate here because it allowed the State to bolster impermissibly the victim's credibility by providing the jury with justification for her conduct on the date of the incident.
Defendant admits that this testimony would be admissible if the State were prosecuting the battered woman on a homicide charge and the woman, as a defendant, offered such expert testimony on her own behalf. In State v. Kelly, 97 N.J. 178, 478 A.2d 364 (1984), the Supreme Court ruled such testimony admissible where it was intended to explain the defendant's state of mind and to bolster her claim of self-defense. Id. at 190, 200-201, 478 A.2d 364.
*611 Here, over defendant's objection, the State offered the expert testimony of Judith Kabus, the director of clinical services at the Women's Resource and Survival Center in Keyport. She testified that the battered woman syndrome comprises eight behavioral characteristics, six of which usually must be exhibited before a woman would be classified as undergoing the syndrome. Kabus also explained the "cycle" of abuse that battered women go through. It begins with the man criticizing the woman for little things, perhaps insulting her or telling her she is not doing something right. It then escalates to a battering episode where the man becomes very abusive and physical. The final phase is the apology, where both the man and woman tend to deny the existence of abuse and to play down what has occurred.
The battered woman places herself in the role of a victim. She blames herself, thereby becoming even more vulnerable to the point where she almost expects it. She is reluctant to tell anybody about what occurs, usually for a variety of reasons. She may be embarrassed, the man might keep her isolated from others, she may hope the situation will change, or she may fear it will get worse if she reports anything. Most significantly, the battered woman cannot just walk away from the situation. She is emotionally dependent on her "man" and is often involved in a love-hate relationship.
After interviewing L.S. for 50 minutes Kabus concluded that she was suffering from the battered woman syndrome because she exhibited a very high degree of seven out of eight of the characteristics: low self-concept, belief in the family unit, a belief that her pregnancy would end the abuse, a history of abuse in her own family, self-blame, and a fear that defendant would come back no matter where she was. Kabus then answered a lengthy hypothetical question which presented her with all of the facts as testified to during the State's case against defendant. Kabus testified that L.S.'s failure to call for help when given the opportunity to do so on the day of the incident was consistent with the battered woman syndrome. *612 According to Kabus, L.S. was following the classic pattern of keeping isolated, being afraid the situation would get worse, denying the severity of the problem, and hoping that her man would change.
Here, because expert testimony was offered by the State in its case in chief to support the victim's credibility, rather than being offered by the defendant to support an affirmative defense, defendant argues that the testimony concerning the battered woman syndrome was inadmissible as an impermissible extension of Kelly. We disagree.
Cases from other jurisdictions which have considered the admissibility of battered woman syndrome testimony have done so in the context of a defendant  a battered woman  offering the testimony to support her theory that she killed her abusive husband or boyfriend in self-defense. See Annotation, "Admissibility of Expert or Opinion Testimony on Battered Wife or Battered Woman Syndrome," 18 A.L.R. 4th 1153 (1982). Nevertheless, there is nothing about the testimony itself which makes it inappropriate for admission as part of the State's case in chief where the woman eventually asserts herself and reports her abuser to the authorities, before she becomes the defendant on trial for committing murder. In Kelly, the court acknowledged the pervasiveness and seriousness of domestic violence, and cited the recent legislative findings in this regard. 97 N.J. at 190-191 n. 2, 478 A.2d 364, citing the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-1 et seq. under which it is "the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-2.
It would seem anomalous to allow a battered woman, where she is a criminal defendant, to offer this type of expert testimony in order to help the jury understand the actions she took, yet deny her that same opportunity when she is the complaining witness and/or victim and her abuser is the criminal defendant.
*613 Defendant challenges the evidence on the sole basis that it allowed the State to bolster the credibility of its own witness. Nevertheless, Evid.R. 20 provides otherwise:
Except as otherwise provided by Rules 22 and 47, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling him may examine him and introduce extrinsic evidence relevant to the issue of credibility....
The exceptions to which Evid.R. 20 referred are not applicable here. Evid.R. 22 provides, among other things: "(c) evidence of traits of his character other than honesty or veracity or their opposites, shall be inadmissible; (d) evidence of specific instances of misconduct, relevant only as tending to prove a trait of his character, shall be inadmissible." Evid.R. 47 permits proof of a trait of character only by "(a) testimony in the form of opinion, (b) evidence of reputation, or (c) evidence of conviction of a crime which tends to prove the trait. Specific instances of conduct not the subject of a conviction of a crime shall be admissible."
Other than the restrictions in Evid.R. 20, Rules 22(c) and (d) and 47, there are no longer any limitations in Rule 20 on the circumstances in which the credibility of a witness can be supported. Biunno, Current N.J. Rules of Evidence, comment 4 to Evid.R. 20 at 262 (1990 Anno.). This is because the amendment to the rule which became effective July 1, 1982, eliminated the language which had previously stated that "no evidence" could be offered for that purpose except to rebut a charge of recent fabrication of testimony. Id. at 262-263 (citing Cogdell v. Brown, 220 N.J. Super. 330, 336, 531 A.2d 1379 (Law Div. 1987)). Thus, the credibility of a witness does not have to have been the subject of attack before it can be bolstered as was traditionally required in past. Biunno, supra, at 263 (citing State v. Parsons, 83 N.J. Super. 430, 437, 200 A.2d 340 (App.Div. 1964)). The party calling a witness may thus attempt to support credibility through direct or redirect examination and through the introduction of extrinsic evidence. Ibid. (citing State v. Johnson, 216 N.J. Super. 588, 603, 524 A.2d 826 *614 (App.Div. 1987)). Expert testimony may now be used to support a witness' credibility. Ibid. (citing State v. Kelly, 97 N.J. at 200-204, 478 A.2d 364)). Likewise, where a sexual assault had allegedly been committed on an infant, expert testimony offered by the proponent of the child's testimony may, under some circumstances, be admissible to assist the jury to evaluate the infant's credibility. Ibid. (citing State v. R.W., 104 N.J. 14, 26, 514 A.2d 1287 (1986)).
Here, there can be no doubt that L.S.'s credibility was very much under attack. The entire theory of the defense was that she and defendant had consensual intercourse and then spent the remainder of the day together. The defense emphasized that L.S.'s testimony at trial and her contrary statement to the police were fabricated to retaliate against defendant. Under these circumstances, the jury was required to assess L.S.'s credibility, not only from her testimony but from her conduct. Having heard that she spent the entire day with defendant, the jury quite properly could have concluded  based on the misconception that battered women are free to leave  that, if L.S. had indeed been assaulted that day, she would have immediately called for help. It required expert testimony to assist the jury in understanding, not whether L.S. was a credible witness on the witness stand, but whether her conduct on April 3, 1986 was consistent with the pattern and profile of a battered woman.
We are satisfied that the expert testimony was properly admitted into evidence to bolster the victim's credibility.

II
In defendant's second and third points, he contends that the court erred by allowing the battered woman syndrome expert, Judith Kabus, to testify because her qualifications in this area were lacking and because the interview she conducted with the victim lasted for merely 50 minutes.
*615 Evid.R. 56, which permits expert testimony in certain instances, provides that a witness who is qualified pursuant to Evid.R. 19 as an expert by virtue of the witness' knowledge, skill, experience, training or education "may testify in the form of opinion or otherwise as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue." Evid.R. 56(2).
Concerning expertise, an expert witness must possess the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion. Hake v. Manchester Tp., 98 N.J. 302, 314, 486 A.2d 836 (1985); Thompson v. Merrell Dow Pharm., 229 N.J. Super. 230, 241, 551 A.2d 177 (App.Div. 1988). When the subject matter of the testimony falls distinctly within the province of a particular profession, the witness should generally be a licensed member of that profession.
In determining the competency of an expert witness, the trial judge is vested with wide discretion. An appellate court will not disturb the trial judge's determination on competency unless a clear abuse of discretion appears. Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 141, 72 A.2d 204 (1950); State v. Chatman, 156 N.J. Super. 35, 40, 383 A.2d 440 (App. Div. 1978), certif. den., 79 N.J. 467, 401 A.2d 224 (1978); Rockland Elec. Co. v. Bolo Corp., 66 N.J. Super. 171, 176, 168 A.2d 817 (App.Div. 1961). A witness' expertise may be acquired by occupational experience or by scientific study. Hence, an expert may be qualified "by study without practice or by practice without study." Chatman, 156 N.J. Super. at 41, 383 A.2d 440 (quoting State v. Smith, 21 N.J. 326, 334, 121 A.2d 729 (1956)). The credibility of the expert, and the weight to be accorded his or her testimony, is assessed by the trier of fact; any testimonial or experience weaknesses in the testimony may be exposed by cross-examination. Angel v. Rand Express *616 Lines, Inc., 66 N.J. Super. 77, 85-86, 168 A.2d 423 (App.Div. 1961).
According to her voir dire testimony, Judith Kabus is eminently well qualified to testify concerning the battered woman syndrome. She was the director of clinical services at a women's resource and survival center. She had her own limited case load and also supervised six other counselors who were at the master-degree level in social work. Kabus herself holds a bachelor's degree in psychology, a master's degree in counseling, and was at the dissertation level for her Ph.D. in marriage and family counseling, which meant that she had already completed all 99 credits of her doctoral course work. She has taken many courses in counseling, both individual and group, and in neuropsychological assessments (evaluating clients). While she has taken no specific course dealing with domestic violence, most of her courses dealt with dysfunctional people, a class which includes battered women.
Prior to obtaining her current position, Kabus was employed for seven years as a counselor at an adult school and had several clients who were battered women. She then became interested in the field and did a research project on this topic for her doctoral degree, spending one full year on it. Kabus has been called upon by various law schools and nursing schools to give training sessions and to conduct workshops on domestic violence, on the cycle of abuse, and on the characteristics of the battered woman and the male abuser. The agency which currently employs her was a member of the Governor's Task Force on Domestic Violence and, as director, Kabus made appearances before the task force on the agency's behalf. Kabus further testified that she was familiar with all of the current scientific literature in the field.
On cross-examination, defense counsel elicited that she had never published any articles and that she had never previously testified as an expert in this field. The trial court ruled her clearly qualified to testify as an expert in the field based on her *617 educational background, her years of experience, the number of studies she had done, and the number of people she had counselled. With regard to her lack of courtroom experience, Judge Ricciardi noted "Someone's got to start somewhere." We agree.
Defendant also challenges Kabus' testimony because she did not treat or counsel L.S., but merely conducted a 50-minute intake interview with her. He contends that there was insufficient foundation for Kabus to conclude that L.S. was suffering from the syndrome. Judge Ricciardi properly noted that there is no requirement than an expert witness counsel or treat a person before he or she may give a psychological diagnosis of that individual. There is no merit to this contention.
We conclude that Kabus had the necessary expertise to testify, both in terms of practice and study, and had a sufficient basis upon which to offer an opinion, from both her personal interview with the victim and her knowledge of the case as supplied to her by a hypothetical question.

III
In defendant's fourth point, he contends that the court erred in admitting into evidence his prior convictions for the purpose of attacking his credibility. We find the arguments of defendant to be entirely without merit. R. 2:11-3(e)(2).
The determination whether a prior conviction may be admitted into evidence against a criminal defendant rests within the broad discretion of the trial judge. State v. Sands, 76 N.J. 127, 144, 386 A.2d 378 (1978). Ordinarily, evidence of prior convictions should be admitted and the burden of proof to justify exclusion rests on the defendant. Ibid. Among the factors for the court to consider concerning admissibility are the lapse of time since the prior conviction, the nature of the prior crime, and the presence of intervening convictions between *618 the prior conviction and the crime for which defendant is being tried. Id. at 144-145, 386 A.2d 378.

IV
In his fifth point, defendant contends that prejudicial error occurred when Detective Rowland, the officer who took a formal statement from the victim, was allowed to testify that, earlier in the day, when L.S. had been treated at the hospital, she had been reluctant to tell anyone about what had happened because of her past experiences in reporting defendant to the authorities.
Without objection, the officer testified as to what L.S. told the police had occurred on the date of the incident. The officer also read from her written statement and at one point, defendant did object on the basis that the testimony was "far enough from the contents of the statement" and was clearly hearsay. Actually the entire statement was hearsay but not objected to up to that point. Since no objection to either out-of-court statement was raised at trial, any error will not be grounds for reversal unless it is clearly capable of producing an unjust result. R. 2:10-2; State v. Macon, 57 N.J. 325, 333, 273 A.2d 1 (1971). The possibility of an unjust result must be "sufficient to raise a reasonable doubt as to whether the court led the jury to a result it otherwise might not have reached." Macon, 57 N.J. at 336, 273 A.2d 1; State v. Melvin, 65 N.J. 1, 18-19, 319 A.2d 450 (1974). We find that there was no plain error, particularly in light of the fact that the statements to which Detective Rowland testified were identical to the testimony given by L.S. herself at trial. See State v. Queen, 221 N.J. Super. 601, 608-609, 535 A.2d 539 (App.Div. 1988), certif. den., 110 N.J. 506, 541 A.2d 1367 (1988) (harmless error to allow police officer to set out victim's complaint in detail in view of victim's own detailed and substantially identical narrative).

*619 V
In his sixth point, defendant contends that the court abused its discretion by permitting into evidence testimony concerning other crimes which defendant had committed, specifically, his prior assaults upon the victim. The State claims that the evidence was properly admitted to show defendant's motive or intent, a pattern of conduct on his behalf, and the nature of the relationship between defendant and the victim. Under the circumstances in this matter, we find that the evidence was relevant and that its probative value outweighed its potential for prejudice.
Evid.R. 55 prohibits the introduction of other crimes or civil wrongs to prove a defendant's criminal disposition as a basis for establishing guilt of the crime charged, but expressly permits such evidence to be admitted to prove other facts in issue, such as motive, intent, plan, knowledge, identity, or absence of mistake or accident. State v. Stevens, 115 N.J. 289, 293, 558 A.2d 833 (1989). The trial court, however, must engage in the task of balancing the probative value of such evidence against its potential for undue prejudice and confusion, so as to guarantee the defendant a fair trial. Id. at 302, 558 A.2d 833. The lower court's decision is entitled to deference since it is in the best position to engage in the balancing process under Evid.R. 4. Hence, its decision should be reversed only if there has been an abuse of discretion. State v. Ramseur, 106 N.J. 123, 266, 524 A.2d 188 (1987).
In Stevens, a police officer was convicted of official misconduct and criminal coercion stemming from two separate incidents with two separate female victims who had come under the defendant's control while he was on duty. The State sought to introduce evidence concerning three other instances of alleged misconduct committed by the defendant. Id. at 294-295, 524 A.2d 188. The trial judge allowed the evidence on the ground that it showed the defendant's intent toward his victims, his plan regarding young women under his control, his *620 attitude toward or relationship to these women, and his state of mind with respect to his sexual desires. Id. at 297, 524 A.2d 188.
In affirming the admissibility of the evidence, the Supreme Court first noted that the examples set forth in Evid.R. 55 are exemplary only and are not intended to be exclusive. Stevens, 115 N.J. at 300, 558 A.2d 833. As long as the evidence is offered to prove a fact which is genuinely in issue, and as long as the evidence is necessary to prove that fact, then the evidence is admissible. Id. at 301, 558 A.2d 833. The evidence must meet an issue relating to an element of the offense which is projected by the defendant or which is necessarily raised by the other evidence. Id. at 302, 558 A.2d 833 (citing State v. Peltack, 172 N.J. Super. 287, 293, 411 A.2d 1156 (App.Div. 1980)), certif. den., 84 N.J. 474, 475, 420 A.2d 1298 (1980)).
The other crimes evidence here, in essence, was part and parcel of the State's theory regarding the battered woman syndrome. To understand why L.S. would not have simply run away from defendant, evidence of the parties' prior relationship, including the prior assaults committed upon the victim by defendant, would indeed have been quite relevant. Viewed in this light, the evidence tended to prove, not necessarily defendant's state of mind but rather L.S.'s. Since the list of examples in Evid.R. 55 is not exhaustive, and since L.S.'s state of mind was a genuine fact which was directly put into issue by defendant, this testimony was admissible.
Here, the probative value of the other crime's evidence did outweigh its capacity for undue prejudice. Underlying R. 55 is the recognition that other crimes evidence may be simultaneously highly probative and extremely prejudicial. Stevens, 115 N.J. at 300, 558 A.2d 833. Undoubtedly, the evidence was prejudicial to defendant in the sense that it was highly damaging to his case. Nevertheless, this cannot by *621 itself be a reason to exclude otherwise admissible and probative evidence.
That evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof. The unwholesome aspects, authored by defendant himself, if the evidence be believed, were inextricably entwined with the material facts. [Stevens, 115 N.J. at 308, 558 A.2d 833 (quoting State v. West, 29 N.J. 327, 335, 149 A.2d 217 (1959)).]
All other crimes evidence, has a capacity to prejudice the jury against a defendant but that is simply not sufficient to require its exclusion. But cf. State v. Jenkins, 234 N.J. Super. 311, 317, 560 A.2d 1240 (App.Div. 1989) (A "borderline" decision to admit other crime's evidence against defendant husband who assaulted his wife was "trampled" by the State in an over-zealous summation. Prosecutor's summation transformed the evidence into proof that defendant was given to continued and accelerating physical abuse of his wife and that if the jury did not convict defendant, he would do it again, with graver consequences. Id. at 317-18, 560 A.2d 1240).

VI
In his final point, defendant contends that his sentence is excessive. He argues that the court improperly cited as an aggravating factor the "hostage" situation to which the victim had been subjected; that the court failed to recognize that the victim still had contact with defendant even after trial, and that the court did not explain how it balanced the aggravating and mitigating factors to arrive at a sentence.
Defendant received the maximum terms and parole ineligibility periods for each of the crimes of which he was convicted and most of the sentences were ordered to run consecutively so that his aggregate sentence is in excess of 30 years with 15 years of parole ineligibility. Nevertheless, on appeal, defendant's attack on his sentence is very narrow; he complains only about specific findings made by the judge.
For example, he complains that it was improper for the court to have implied that L.S. was held hostage for the *622 day. Yet the facts developed support that finding. While defendant was not charged with criminal restraint or kidnapping, this did not mean that the judge could ignore the realities of what had transpired that day. Defendant also complains that the court overlooked the fact that L.S. came to visit defendant in jail subsequent to trial and that she still proclaimed her love for him. This, however, serves only to prove that L.S. is indeed following the classic pattern of a battered woman  not that defendant is somehow worthy of her love or attention.
Finally, defendant complains that the court failed to explain how the sentences were determined and how the court balanced the aggravating and mitigating factors. However, Judge Ricciardi noted that many aggravating factors were present. He pointed to the following factors: the nature and circumstances of the offense, specifically that the incident had occurred over an entire day and involved long-term contact with the victim; the gravity of the harm, especially because the injury necessitated 15 stitches; the risk that defendant would commit another crime; the extent of his prior record, specifically that his record is replete with prior acts of violence, and the need for deterrence. See N.J.S.A. 2C:43-6b; N.J.S.A. 2C:44-1f. No mitigating factors were found. Since it is clear that the aggravating factors substantially outweigh the mitigating factors, the court was certainly justified in imposing terms greater than the presumptive and in attaching parole ineligibility conditions.
We are satisfied that the sentence falls within the guidelines of appellate review as stated in State v. Roth, 95 N.J. 334, 363-365, 471 A.2d 370 (1984).
Affirmed.