**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1710-23

ORLANDO TORRES,

      Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
PUBLIC EMPLOYEES'
RETIREMENT SYSTEM,

      Respondent-Respondent.

_____

Argued December 3, 2025 – Decided February 12, 2026

Before Judges Paganelli and Jacobs.

On appeal from the Board of Trustees of the Public Employees' Retirement System, Department of the Treasury, PERS No. xx0098.

Samuel M. Gaylord argued the cause for appellant (Szaferman Lakind Blumstein & Blader PC, attorneys; Samuel M. Gaylord, on the brief).

Yi Zhu, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Yi Zhu, on the brief).

PER CURIAM

Petitioner Orlando Torres appeals from a final agency decision by the Board of Trustees, Public Employees Retirement System (Board), finding he was not entitled to accidental disability retirement (ADR) benefits under N.J.S.A. 43:15A-43(a). Based on our careful review of the record and the applicable law, we affirm.

We glean the relevant facts and procedural history from the record. At the time of the incident at issue, Torres was employed as a Juvenile Detention Officer (JDO) for over seventeen years. The Administrative Law Judge (ALJ) described the incident as follows:

> On April 7, 2019, Torres was working the day shift in residence unit C-2, which housed six or seven juveniles. A code was called regarding a fight in residence unit C-1.[*] After ensuring the residents of C-2 were locked back in their rooms, Torres ran to unit C-1 and saw two residents fighting and Officer Anissa Simmons trying to pull one of the two away. Torres pulled the other resident away; the resident resisted, their feet became tangled, and they fell together to the floor. Both Torres'[s] knees "slammed" on the cement floor (which was covered with a light carpet). . . . He held the resident down until other officers came.
>
> _____
>
> [*] Torres described a "code" as a signal of trouble with the juvenile residents to which all officers are required to respond.

2

[(Footnote omitted).]

Because of injuries sustained to his right knee, Torres was found to be "totally and permanently disabled."  The Board granted ordinary disability retirement benefits to Torres but denied him ADR benefits.  Torres "requested a hearing, and . . . th[e] matter was transmitted to the Office of Administrative Law . . . as a contested case."  The ALJ held hearings over three days and permitted post-hearing briefs after the parties received the transcripts.

The ALJ heard testimony from Torres, David Weiss, D.O., and Jeffrey Lakin, M.D.  Dr. Weiss was "qualified as an expert in orthopedics and as an" Independent Medical Examiner (IME).  He presented testimony on behalf of Torres.  Dr. Lakin "was qualified as an expert in orthopedics and orthopedic surgery" and presented testimony on behalf of the Board.

The ALJ found Torres "was credible when he described his job and job training, his physical condition prior to the incident, and the physical limitations after the incident which led him to an early retirement."  However, "[w]hile he tried to say that it was unusual . . . for only two JDOs to respond to the fight between residents, [Torres] admitted that two JDOs were enough to handle this incident and that is not an uncommon occurrence."

A-1710-23

Further, the ALJ found Torres had "changed his story since 2019." The ALJ noted Torres "told medical professionals at the time of the incident that he struck his right knee on the wall" and "[h]e told Dr. Weiss at his IME that he struck his knee on the wall."

However, Torres "stated at the hearing that he slammed both his knees on the ground." Further, Torres "stated that shortly after the incident, he 'felt some throbbing' in both knees." The ALJ concluded that "[f]alling to the floor is consistent with tripping." "However, if he fell on both knees to the floor, and both knees were initially 'throbbing[,]'[] but the right knee only was drained of fluid, and only the right knee developed disabling pain, . . . Dr. Lakin is correct, the existing arthritis in the right knee was exacerbated by the incident." (Emphasis omitted).

The ALJ stated it was "within the province of the finder of facts to determine the credibility, weight, and probative value of the expert testimony." The ALJ noted, Dr. Weiss "concluded that the incident of April 7, 2019, was the direct cause of [Torres]'s disability," while Dr. Lakin "concluded that pre-existing arthritis, aggravated by the April 7, 2019[] incident, was the cause of Torres'[s] disability."

A-1710-23

The ALJ found both experts "to be credible, competent witnesses." However, the ALJ determined, "Dr. Lakin's conclusions f[ou]nd support in the medical records of Torres'[s] treating physician . . . and Dr. Weiss disagree[d] with" the treating physician. Indeed, the ALJ found "Dr. Weiss did not have the benefit of [the treating physician's] medical treatment notes when he wrote his report, and those notes focus on arthritis as the cause of [Torres]'s ongoing knee pain." The ALJ concluded "[i]n contrast, Dr. Lakin's conclusions are supported by Torres'[s] medical history and medical records, as well as the opinion of . . . the treating physician."

The ALJ found Torres had sustained a right knee injury, in approximately 1989. The knee required surgery. In approximately 2001, Torres was hired as a JDO. During his employment, Torres "worked twelve-hour shifts and overtime without physical limitations" and never sought medical care "for any issues related to his right knee."

Further, "[b]reaking up fights between residents . . . was a regular part of the job of a JDO." Indeed, Torres "was trained for such situations, understood the risks involved, and was aware that other JDOs had been injured in similar situations." Moreover, while "[t]ypically, . . . all available officers respond to a code, . . . Torres testified, not all fights between residents require five or six

A-1710-23

officers and it [wa]s not unusual for two officers to resolve a situation before a full complement of officers arrive. . . ."

In addition, the ALJ found "Torres did not lack preparation, training or equipment . . . nor was he injured as a result of unforeseen action (or inaction) by third parties." Instead, "Torres 'was doing exactly what he intended – restraining juvenile residents and breaking up a fight.'" Indeed, "[b]reaking up fights between residents was not an unusual occurrence; [Torres] had been trained in how to conduct physical restraints and he used this training frequently."

Moreover, the ALJ found:

> During the incident of April 7, 2019, [Torres] struck his knees on the wall or the floor sufficient to require medical attention. Twenty-three days after the incident, an MRI was performed on [his] right knee, which showed arthritis. The experts agree that the arthritis shown by the April 30, 2019[] MRI did not develop in twenty-three days.
>
> While any injuries to [Torres]'s left knee healed, his right knee required surgery, which was performed in July 2019. The surgery did not fully address the condition of [Torres]'s right knee; shortly after, Torres was deemed totally and permanently disabled from the performance of the duties of a JDO.

The ALJ further determined:

A-1710-23

> Even if . . . [she] were to conclude that the injury suffered by [Torres] on April 7, 2019, was the substantial cause of his disability, it would not be enough because the incident in which [Torres] was injured was not undesigned and unexpected and, therefore, does not meet the . . . [appropriate] standard.

> . . . Torres has not shown by a preponderance of the credible evidence in the record that the incident of April 7, 2019, was the direct cause of his total and permanent disability and Torres has not shown by a preponderance of the credible evidence in the record that the incident of April 7, 2019, was undesigned and unexpected.

The ALJ affirmed the Board's denial of Torres's application for ADR benefits and dismissed his appeal. The Board adopted the ALJ's decision in a January 18, 2024 final agency decision.

On appeal, Torres contends: "The pivotal legal issue . . . is whether or not the April 7, 2019 incident was an 'undesigned and unexpected event.'" He argues "the Board erred in applying an unduly restrictive notion of an 'undesigned and unexpected' event." Torres acknowledges "he was trained on the policies and procedures of the institution" and "that he had responded to other incidents in his [seventeen] years as a JDO" but asserts this time "he tripped attempting to restrain the inmate." Torres contends "[i]t is the unexpected tripping" that

A-1710-23

allows him to "meet[] the '[u]ndesigned and [u]nexpected' Richardson[1] requirement."

In addition, Torres contends he "has demonstrated that his disability was substantially caused by the . . . incident." Torres argues he "is not required to prove that the incident was the sole cause of his permanent disability[;] rather he is only required to provide proof that the incident was the substantial contributing cause of his permanent disability." Torres concedes "[t]he outcome of this case turns on the credibility of the medical experts."

Our review of an agency determination is limited. Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018). An appellate court "may not substitute its own judgment for the agency's, even though the court might have reached a different result." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 483 (2007)). An administrative agency's determination "will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14,

---

1 Richardson v. Bd. of Trs., Police & Firemen's Retirement System, 192 N.J. 189, 212-13 (2007).

27 (2011)). We "review[] agency decisions under an arbitrary and capricious standard." Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." Lavezzi v. State, 219 N.J. 163, 171 (2014) (alteration in original) (quoting In re J.S., 431 N.J. Super. 321, 329 (App. Div. 2013)).

Our review is limited to the following inquiries:

(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;

(2) whether the record contains substantial evidence to support the findings on which the agency based its action; and

(3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Allstars Auto Grp., 234 N.J. at 157 (quoting In re Stallworth, 208 N.J. at 194).]

In reviewing an agency's decision, we "must be mindful of, and deferential to, the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

However, we review an agency's interpretation of the law de novo. Russo, 206 N.J. at 27.

To establish entitlement to ADR benefits, under N.J.S.A. 43:15A-43(a), an applicant must prove

> 1. that he is permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is
>
>> a. identifiable as to time and place,
>>
>> b. undesigned and unexpected, and
>>
>> c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;
>
> 4. that the disability was not the result of the member's willful negligence; and
>
> 5. that the member is mentally or physically incapacitated from performing his usual or any other duty.
>
> [Richardson, 192 N.J. at 212-13.]

Here, our focus is on Richardson's requirements concerning whether Torres's "traumatic event" was "undesigned and unexpected" and whether it was "caused by a circumstance external" to him. See ibid.

Satisfaction of the "undesigned and unexpected" factor requires an event "extraordinary or unusual in common experience" and not "[i]njury by ordinary work effort." Id. at 201 (emphasis omitted) (quoting Russo v. Tchrs.' Pension & Annuity Fund, 62 N.J. 142, 154 (1973)). "The polestar of the inquiry is whether, during the regular performance of [the member's] job, an unexpected happening . . . occurred and directly resulted in the permanent and total disability of the member." Id. at 214. "[W]hen all that appears is that the employee was doing his [or her] usual work in the usual way," the "undesigned or unexpected" element is not satisfied. Id. at 201 (emphasis omitted) (quoting Russo, 62 N.J. at 154).

"[A]n employee who experiences a horrific event which falls within his job description and for which he has been trained will be unlikely to pass the 'undesigned and unexpected' test." Russo, 206 N.J. at 33; see Thompson v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 449 N.J. Super. 478, 503 (App. Div. 2017) (noting "a member's training must be considered").

Nevertheless, the Court has stated that its "comment about training in Russo, 206 N.J. at 33[,] should not be construed to mean that the inquiry regarding whether an event is 'undesigned and unexpected' is resolved merely by reviewing the member's job description and the scope of his or her training."

11

Mount v. Bd. of Trs., Police & Firemen's Ret. Sys., 233 N.J. 402, 427 (2018) (citation reformatted). While,

> [i]n a given case, those considerations may weigh strongly for or against an award of accidental disability benefits. To properly apply the Richardson standard, . . . the Board and a reviewing court must carefully consider not only the member's job responsibilities and training, but all aspects of the event itself. No single factor governs the analysis.
>
> [Ibid.]

In Richardson, "[t]he only contested issue was whether th[e] incident constituted a traumatic event." 192 N.J. at 214. There, the petitioner "was employed as a corrections officer for the South Woods State Prison." Id. at 193. The petitioner responded to "an emergency signal" regarding "an inmate violently resist[ing] being handcuffed." Ibid. "Two witnesses testified concerning the issue of whether such violent resistance [wa]s . . . part of the normal course of a corrections officer's duties. Both attested that it was not." Id. at 194. The petitioner "contend[ed] that such violent resistance [wa]s not part of the stress and strain of a corrections officer's normal work effort." Ibid. The Supreme Court held, in part, that "[g]iven . . . [its] discussion of work effort, [the petitioner] satisfied the accidental disability statute." Id. at 214.

In <u>Russo</u>, the petitioner was

> a newly-minted police officer, with no psychiatric history, completely untrained and unequipped for firefighting, was ordered into a burning building and, with his fellow officers, bravely rescued three of the four occupants. The intensity of the fire terrified and disoriented [the petitioner], singed his uniform, and sent him to the hospital overnight for smoke inhalation. One person in the house, who cried out for help . . ., could not be reached because of the fire's ferocity and perished. Thereafter, the victim's family heaped scorn on [the petitioner] and blamed him for their relative's death. It was as a result of the fire and the confluence of events it generated, including the death of the victim and the relatives' accusations, that [the petitioner] was rendered permanently . . . disabled. Those circumstances plainly satisfied . . . <u>Richardson</u> and, in our view, are exactly what the Legislature had in mind when it enacted the accidental disability statutes.
>
> [<u>Russo</u>, 206 N.J. at 34-35.]

In <u>Mount</u>, "the Court review[ed] two determinations . . . each involving . . . police officer[]s." 233 N.J. at 407. In one review, a petitioner "witnessed at close range the incineration of three young victims in an explosion after a high-speed motor vehicle collision." <u>Id.</u> at 408. The Court held the petitioner had proved "that the event was undesigned and unexpected within the meaning of <u>Richardson</u>." <u>Ibid.</u> The Court found:

> By virtue of his job description, training, and prior experience, [the petitioner] could anticipate being called to accidents that were serious or even fatal. As

13

his job description suggests, in some circumstances [he] would be expected to remove victims from a damaged vehicle pending the arrival of medical personnel. [He], however, was not trained to combat, unassisted, an explosion of such magnitude experienced at such a close range. With no firefighting equipment or protective gear, he was helpless in the face of a terrible tragedy.

We conclude that by virtue of those extraordinary circumstances, [the petitioner] confronted an incident that was undesigned and unexpected, and therefore satisfied that component of the Richardson test.

[Id. at 427-28.]

The second determination involved "a lengthy hostage negotiation [that] ended with the shooting death of the hostage-taker, as he and [the petitioner] spoke by cellphone." Id. at 408. The Court held the petitioner had "not demonstrated that the incident that caused his disability was undesigned and unexpected under the Richardson test." Ibid. The Court stated petitioner

had reason to anticipate that, without prior warning to him, a tactical entry might be made.

Moreover, the ALJ and the Board did not rely exclusively on . . . training. Instead, they considered evidence regarding the precise police tactics that were used in this specific case and the warning that those tactics gave [the petitioner] that the hostage standoff might end violently.

. . . the Board's conclusion that [the] shooting was not undesigned and unexpected was premised on far more

than a formulaic review of [the petitioner]'s job description and training. It was also based on the sequence of events that led to [the] death. Although the shooting was clearly devastating . . . it was not "undesigned and unexpected" under Richardson.

[Id. at 430-31.]

In Moran v. Board of Trustees, Police & Firemen's Retirement System, 438 N.J. Super. 346 (App. Div. 2014), we reversed a decision denying a firefighter's "application for an [ADR] pension." Id. at 347. We noted:

> Breaking into burning buildings was not [the petitioner]'s normal unit assignment. He was part of an "engine company" whose role was to "take[ ] the hoses into the [burning] building . . . and put[ ] out the fire." A different unit, the "truck company," was responsible for forcing entry into a burning structure and rescuing any occupants. The truck company carried various special equipment specific to those functions. The two units were supposed to respond to a fire scene at the same time.
>
>     . . . .
>
> As [the petitioner] was unrolling the hose toward the building, which was engulfed in flames, he unexpectedly heard screams from people trapped inside the structure. He testified that a truck company would have had special equipment, such as a "[h]ydraulic ram, a battering ram, [and a] haligon tool with an ax." He testified that he had none of those tools with him and typically would not have them. But, because he heard people screaming inside the building, he used his "shoulder, leg and back" to break down the door. He

15

testified that the door "was well fortified, but [he] eventually did" break through it.

Although his fire training involved using tools such as a "hydraulic ram" to break down doors, not forcing entry with his body, [the petitioner] testified that if he had not opened the door, the people inside would have died. He also testified that, but for the unexpected presence of the victims in the burning building, and the unexpected absence of the truck company, he would not have tried to open the door.

[Id. at 349-50 (all but first, fifth, and ninth alteration in original).]

We concluded, "[n]othing in the history of the pension statute, as exhaustively reviewed in Richardson, suggests that the Legislature would have intended to deny [the petitioner] an accidental disability pension in these circumstances." Id. at 355.

In Brooks v. Board of Trustees, Public Employees' Retirement System, 425 N.J. Super. 277 (App. Div. 2012), the petitioner

was employed . . . as a custodian. One of his responsibilities, in addition to cleaning classrooms, was to move furniture and equipment around the school.

[The petitioner] . . . saw a group of teenage boys attempting to carry a large unwieldy weight bench weighing approximately 300 pounds into the school. [He] had not previously seen this piece of equipment, . . . nor had he ever moved any other weight bench.

16

[The petitioner] . . . asked two of the boys to help him tip the weight bench on its end and lift it onto the flatbed truck so it could be brought into the gymnasium. [The petitioner] and the boys began this maneuver. However, when the bench was "halfway up," the boys . . . dropped their side of the bench. [The petitioner] heard his shoulder "snap" as the bench fell to the floor, which resulted in a total and permanent disability. [The petitioner] said he did not drop his side of the bench when he saw the boys drop their side because one of his feet was directly underneath the bench.

[425 N.J. Super. at 279-280.]

We concluded:

[T]he accident was clearly "undesigned and unexpected." [The petitioner] was confronted with the unusual situation of a group of students attempting to carry a 300-pound weight bench into the school, and then, after [the petitioner] took charge of this activity, the boys suddenly dropping one side of the weight bench, placing its entire weight on [the petitioner].

[Id. at 283.]

Therefore, in applying the "undesigned and unexpected" element of the Richardson test, we consider a petitioner's job responsibilities and training as well as all aspects of the event itself. See Mount, 233 N.J. at 427; Thompson, 449 N.J. Super. at 503. In reviewing all aspects, we determine whether there was something about the event that was out of the "normal," Richardson, 192 N.J. at 194; "extraordinary," id. at 201 (quoting Russo, 62 N.J. at 154); Mount,

233 N.J. at 428; or "unusual," Brooks, 425 N.J. Super. at 283; as opposed to "anticipated" or forewarned, Mount, 233 N.J. at 418.

With respect to causation, the "requirement that a disability be the 'direct result' of the employment-related traumatic event, . . . impose[s] a more exacting standard of medical causation." Gerba v. Bd. of Trs., Pub. Emps. Ret. Sys., 83 N.J. 174, 185 (1980). The alleged traumatic event must be "the essential significant or the substantial contributing cause of the resultant disability." Id. at 186. "Where there exists an underlying condition . . . which itself has not been directly caused, but is only aggravated or ignited, by the trauma, then the resulting disability is, in statutory parlance, 'ordinary' rather than 'accidental' and gives rise to 'ordinary' pension benefits." Ibid.

Whether a member's disability is the direct result of a traumatic event is within the ambit of expert medical opinion. Korelnia v. Bd. of Trs., Pub. Emps. Ret. Sys., 83 N.J. 163, 171 (1980). In general, "[t]he credibility of the expert, and the weight to be accorded his or her testimony, is assessed by the trier of fact[.] . . ." State v. Frost, 242 N.J. Super. 601, 615 (App. Div. 1990).

Applying this well-established law, we conclude Torres failed to sustain his burden to prove the Board's denial of his application for accidental disability was arbitrary, capricious, or unreasonable. First, there is no evidence that the

A-1710-23

event was "undesigned and unexpected." Instead, Torres was fully trained and prepared for the event. There was nothing out of the norm, extraordinary or unusual. The event was anticipated, and Torres had fair warning regarding what to expect.

Further, we have no reason to substitute our judgment for the Board's regarding causation. The parties agree the experts' testimony was essential to the determination of causation, and the ALJ concluded Dr. Lakin was more credible. The Board adopted that finding, and there is substantial evidence in the record to support it.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

19