863 A.2d 380 (2004)
374 N.J. Super. 25
STATE of New Jersey, Plaintiff-Respondent,
v.
Walter TOWNSEND, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 17, 2004.
Decided January 3, 2005.
*381 Jay L. Wilensky, Assistant Deputy Public Defender, argued for the appellant (Yvonne Smith Segars, Public Defender of New Jersey, attorney; Mr. Wilensky, of counsel and on the brief).
Debra A. Owens, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General of New Jersey, attorney; Ms. Owens, of counsel and on the brief).
Before Judges KING, R.B. COLEMAN and HOLSTON, JR.
The opinion of the court was delivered by
KING, P.J.A.D. (retired and temporarily assigned on recall).
On October 23, 2002 Walter Townsend, now age sixty, was convicted of murder in violation of N.J.S.A. 2C:11-3a(2). The homicide occurred in 1981. The victim was Townsend's girlfriend, Norma Williams. In March 2003 Townsend was sentenced to a custodial term of thirty years to life. He now appeals his conviction and sentence. We reverse the conviction because of error in the admission of expert testimony on Battered Women's Syndrome (BWS) and in the jury instruction on expert testimony.

*382 I
On January 30, 2002 a Mercer County Grand Jury returned an indictment charging defendant with the knowing or purposeful murder of his girlfriend, Williams, also known as "Nicky," in violation of N.J.S.A. 2C:11-3a(2). The alleged murder occurred on December 12, 1981.
The trial judge held extensive pretrial evidentiary hearings over four different days between October 1 and October 8, 2002. The hearings involved the legality of the twenty-year delay between the crime charged and the indictment; the adequacy of the victim's dying declaration, in which she declared, through her head motions, that a car, not a truck, hit her and that defendant did not beat her; the admissibility of BWS expert testimony used to attack the credibility of the victim's dying declaration; and the admissibility of statements the defendant and other witnesses made to the police.
The trial was held between October 9 and October 23, 2002. At trial, the State sought to prove that around 6 p.m. on December 11, 1981 defendant drove to 64 Bond Street in Trenton where he and Williams lived together. He came into the house and told Williams's sons, Jason Williams, age seven, and Brian Williams, age three, to go upstairs. The sons said they only went up the stairs part-way and watched as defendant proceeded to beat Williams, sitting on a couch, with a two-by-four with a nail in it. Defendant beat Williams until she was motionless and groaning. He then picked her up to take her to the hospital; he told the two boys to come with him.
Defendant took Williams and the two boys to the hospital in his blue truck. Upon leaving, defendant crashed through a gate to the front yard of the house. When they arrived at the hospital, Williams was examined in the emergency room by a Dr. Abud. The doctor's notes indicated she was drowsy, with low blood pressure, alcohol on her breath, and no damage to her brain stem. Williams had a cut over her right eye, a compound fracture of her left femur, a fracture of her left tibia, and a fracture of the right femur. Her left upper thigh was grossly swollen and externally rotated. Williams had indications of internal injuries, and fractures of her right humerus and left humerus. The doctor also noted possible fractures of her left wrist and hand. The doctor prescribed 100-per-cent oxygen and intravenous fluids. Around 9:15 p.m., Williams received blood transfusions. At 11:45 p.m., her eyes were rolled back and she was moaning. At 11:50 p.m. she went into respiratory arrest and at 12:10 a.m. Williams was pronounced dead. The Mercer County medical examiner, Dr. Raafat Ahmad, performed an autopsy and identified shock and massive hemorrhage from multiple traumatic injuries as the cause of her death.
The State produced evidence that while Williams was at the hospital, various members of the Trenton police were dispatched to investigate the incident. Patrolman Joseph Salvatore arrived at the hospital and spoke to Williams around 6:45 p.m. She told him she had been struck by a car. Patrolman Salvatore then went to the waiting room to talk to defendant and the two children. Jason told the officer that a red truck hit his mother on Bond Street and then three white men got out and beat her with sticks. Defendant said he got home and saw Williams bleeding against the gate outside 64 Bond Street. He then took her to the hospital.
Another Trenton police officer, Detective Theodore Pogorzelski, arrived at the hospital around 9:30 p.m. He met with defendant and the two boys. Jason told the detective that a red tow truck ran over *383 his mom but he did not see any white men. At around 11:30 p.m., Dr. Abud permitted Detective Pogorzelski to speak with Williams, although he warned communication would be difficult. The detective told Williams that things did not look good and he needed a statement from her. The detective asked her if defendant beat her, and she shook her head side-to-side indicating "no." Again she shook her head indicating "no" when the detective asked if she was hit by a truck. She nodded a "yes" when the detective asked if she was hit by a car.
While Detective Pogorzelski was at the hospital, Detectives Taylor and Paccillo investigated the area of 64 Bond Street for evidence of a hit-and-run accident. They found one of the gates by the driveway smashed; the damaged parts contained specks of blue paint, not red paint. The officers found no automobile debris or blood. Tire tracks went to the back of the house. When these officers looked for witnesses, all refused to speak. Two other officers, Officers Hoffman and Rowland, searched for defendant's blue pickup truck and found it in the hospital parking lot with damage to the left rear.
A few hours after Williams died, defendant and the two children were taken to Trenton police headquarters. At headquarters, defendant was separated from the two boys. Jason, the older boy, told Officer Hoffman and a Sergeant Golden that defendant and Williams got into a fight and defendant beat her with a stick. Detectives Pogorzelski and Taylor then interviewed Jason, and he again said defendant beat his mother with a stick. Jason said he told the story about the white men at the defendant's direction.
Detectives Pogorzelski and Taylor then interviewed defendant. Defendant told them he was at a bar when Jason came to tell him Williams was hit by a truck. Defendant said he found Williams in the driveway moaning that a red car smashed through the gate. At around 11:30 a.m. on December 12 defendant gave a written statement but in this recitation he said Williams was leaning against the house, not the gate. Around 1 p.m., Detective Pogorzelski obtained a formal statement from Jason. Defendant was not formally charged as a result of this investigation.
After Williams' death, Jason and Brian lived with Williams' brother and his wife in Browns Mills. When Brian, the younger boy, turned eighteen, he moved to Trenton and sought to contact defendant, who was also living in Trenton. At one point, Brian visited defendant, and defendant asked what Brian thought happened to his mother. Brian said that defendant murdered her and defendant became hysterical.
In May 2001, Brian heard about a newspaper article discussing numerous unsolved homicides, including his mother's. He contacted Jason, who asked the Mercer County Prosecutor's Office to reopen the investigation, which it did on August 2, 2001. On August 10, 2001 Brian gave a formal statement detailing what he saw on the night his mother died. On the same day defendant was arrested for the murder. After defendant was arrested, he was placed in a cell and later was found naked hanging from the cell door with his pants around his neck. The police revived defendant after this apparent suicide attempt.
In addition to the testimony at trial of Jason, Brian, the several police officers, and the hospital personnel, the State produced the testimony of Freddie Williams, the brother of Jason and Brian, age fifteen at the time of Williams's death. Freddie had not been living with his mother at the time of her death. He testified to prior acts of violence by defendant against Williams. Annissa Gaines, who lived on *384 Bond Street and was age thirteen when Williams died, testified that on the night of Williams' death she saw defendant ram through the front gate. Patricia Brevard, Williams' best friend, testified that defendant spoke to her after Williams died, and on one occasion said he beat Willilams and ran over her with the truck before he took her to the hospital. Brevard did not tell police because of her fear of the defendant. The State also presented testimony from a Battered Women's Syndrome (BWS) expert, Dr. Judith Kabus, in an effort to discredit Williams' putative dying declaration that she was hit by a car. Dr. Kabus could not conclude Williams had BWS.
Defendant's main trial strategies were to discredit the State's case by cross-examining its witnesses, to rely upon Williams' dying declaration, and to counter Dr. Kabus' BWS testimony. For this latter purpose defendant presented the testimony of Dr. Richard Coughlin, a licensed psychologist, who testified about BWS as part of Post-Traumatic Stress Disorder (PTSD). Dr. Coughlin was the only defense witness.
The jury found defendant guilty of murder. On March 28, 2003 the trial judge sentenced him to a term of thirty years to life. This appeal ensued.

II
Defendant raises these four points on this appeal.
POINT I
THE TRIAL COURT ERRED TO DEFENDANT'S GREAT PREJUDICE BY PERMITTING TESTIMONY CONCERNING BATTERED WOMEN'S SYNDROME WHEN THE STATE'S OWN EXPERT DECLINED TO IDENTIFY THE PURPORTED VICTIM AS SUFFERING FROM THE SYNDROME, AS WELL AS BY FAILING TO DELIVER AN APPROPRIATE LIMITING INSTRUCTION (Partially Raised Below)
A. The Trial Court Erred Grievously by Permitting Testimony Concerning Battered Women's Syndrome When the State's Own Expert would Not State that the Purported Victim Suffered From the Syndrome
B. The Trial Court Failed to Deliver An Appropriate Limiting Instruction As To the Use of the Expert Testimony. (Not Raised Below)
POINT II
THE DEFENDANT'S RIGHT TO DUE PROCESS WAS VIOLATED BY THE STATE'S DELAY OF NEARLY TWENTY YEARS IN PROSECUTING THIS MATTER. U.S. Const., Amend XIV; N.J. Const. (1947), Art. 1, par. 10
POINT III
THE TRIAL COURT ERRED TO DEFENDANT'S GREAT PREJUDICE BY ADMITTING TESTIMONY CONCERNING ALLEGED PRIOR INSTANCES OF VIOLENCE BY THE DEFENDANT
POINT IV
THE TRIAL COURT IMPOSED AN ILLEGAL SENTENCE, NECESSITATING REDUCTION
As noted, we reverse and remand for a new trial on defendant's first point. We also consider the claims raised in Points II and III because of their implications for a new trial.

III
We first consider whether the defendant's right to due process was violated because of the lapse of almost twenty years in prosecuting the case. U.S. Const., amend XIV; N.J. Const. art. I, ¶ 10. There is no time bar to a murder prosecution. See N.J.S.A. 2C:1-6a ("[a] prosecution for any offense set forth in *385 N.J.S.A. 2C:11-3 ... may be commenced at any time.") The 1971 Commission Commentary to N.J.S.A. 2C:1-6 explains why there is no time bar for murder:
The Code provides for limitation for all offenses except for murder (§ 2C:1-6a), the view being that it is desirable to maintain the common police practice never to close the files on an unsolved murder case. Granting the fact that there are other crimes of comparable gravity, we believe that they are less likely to present equal obstacles to prompt discovery of evidence or to have comparably long continued impact on the sense of general security of the community.
[See Cannel, New Jersey Criminal Code Annotated, comment 3 on N.J.S.A. 2C:1-6 (quoting 1971 Commission Commentary).]
Defendant presents the rare question of whether other principles, namely due process protections, may still bar a murder prosecution where a statutory time-bar does not exist.
The indictment charges Townsend with the murder of Williams on December 12, 1981. The date of the indictment was January 30, 2002. The time from the alleged murder to the indictment was just over twenty years. Because of this period, Defendant moved to dismiss the indictment under R. 3:25-3 which states:
If there is an unreasonable delay in presenting the charge to a grand jury or in filing an accusation against a defendant who has been held to answer upon a complaint, the Assignment Judge, or the Assignment Judge's designee, may dismiss the matter sua sponte or on motion of the defendant. If there is unreasonable delay in the disposition of an indictment or accusation, the judge to whom the case has been assigned may dismiss the matter sua sponte or on motion of the defendant.
The Law Division judge heard arguments on defendant's motion and denied defendant's request. The judge remarked that the relevant "delay" was from the date of the incident to the date of indictment, not from the date of indictment to the date of trial. As for the proper test to apply, the judge cited to State v. Cappadona, 127 N.J.Super. 555, 318 A.2d 425 (App.Div.), certif. denied, 65 N.J. 574, 325 A.2d 707, cert. denied, 419 U.S. 1034, 95 S.Ct. 518, 42 L.Ed.2d 310 (1974). The judge acknowledged Cappadona was not directly on point; it dealt with the delay between indictment and trial. Still, the judge observed that the four factors Cappadona deemed relevant  length of delay, reason for delay, defendant's assertion of his right, and the prejudice from the delay  might be relevant to defendant Townsend's situation.
The judge then discussed State v. Alexander, 310 N.J.Super. 348, 708 A.2d 770 (App.Div.), certif. denied, 156 N.J. 408, 719 A.2d 640 (1998). In that case, the defendant faced many charges including attempted murder and armed robbery. This pre-indictment delay was nearly two-and-one-half years. Id. at 350-353, 708 A.2d 770. We there observed that the Sixth Amendment Speedy Trial Clause does not apply to pre-indictment delay because the Sixth Amendment is not triggered until arrest or indictment. Alexander, 310 N.J.Super. at 352-53, 708 A.2d 770 (citing United States v. Lovasco, 431 U.S. 783, 788-89, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752, 758 (1977); United States v. Marion, 404 U.S. 307, 313-23, 92 S.Ct. 455, 463-64, 30 L.Ed.2d 468, 474-80 (1971)). Alexander found the validity of a pre-indictment delay is better measured by the due process clauses of the federal and state constitutions. For that analysis, Alexander quoted *386 State v. Aguirre, 287 N.J.Super. 128, 132, 670 A.2d 583 (App.Div.), certif. denied, 144 N.J. 585, 677 A.2d 758 (1996):
The due process inquiry focuses on whether the delay "violates those `fundamental conceptions of justice which lie at the base of our sense of fair play and decency.'" United States v. Lovasco, [supra,] 431 U.S. at 790, 97 S.Ct. at 2049, 52 L.Ed.2d at 759 (citations omitted). Unlike analysis under the Sixth Amendment's Speedy Trial Clause, which involves a four-factor balancing test and under which prejudice to the defense is presumed from an unusually long delay between indictment and trial, [citations omitted], claims under the Due Process Clause arising from undue preindictment or pre-arrest delay are measured by a far more rigorous standard. In order to prevail, a defendant must demonstrate "both that (1) there was no legitimate reason for the delay and (2) [defendant] was prejudiced thereby." State v. Rodriguez, 112 N.J.Super. 513, 515, 271 A.2d 905 (App.Div.1970).
[Alexander, 310 N.J.Super. at 353, 708 A.2d 770 (quoting Aguirre, 287 N.J.Super. at 132, 670 A.2d 583).]
As for the first prong, the Alexander court noted a split in the federal circuits as to whether a defendant must show the delay was the "product of intentional governmental action to gain some tactical advantage over the accused or for some other impermissible, bad faith purpose." Id. at 353-355, 708 A.2d 770. Rather than determining whether the defendant Alexander met the first prong, the court assumed that prong was met and rested the decision on Alexander's failure to meet the second prong on actual prejudice. Judge Skillman there said:
"The law is well-settled that actual prejudice, not possible or presumed prejudice, is required to support a due process claim." State v. Aguirre, supra, 287 N.J.Super. at 133, 670 A.2d 583. "[T]he defendant must show `the delay caused "actual and substantial prejudice'" endangering his right to a fair trial and `must present concrete evidence showing material harm.'" Id. at 134, 670 A.2d 583 (quoting United States v. Anagnostou, 974 F.2d 939, 941-42 (7th Cir.1992), cert. denied, 507 U.S. 1050, 113 S.Ct. 1943, 123 L.Ed.2d 649 (1993)). "Vague assertions of lost witnesses, faded memories, or misplaced documents are insufficient to establish a due process violation from pre-indictment delay." United States v. Beszborn, 21 F.3d 62, 67 (5th Cir.), cert. denied, 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 288 (1994). "A mere loss of potential witnesses is insufficient absent a showing that their testimony `would have actually aided the defense.'" [United States v. Crouch, 84 F.3d 1497, 1515 (5th Cir.1996) (en banc), cert. denied, 519 U.S. 1076, 117 S.Ct. 736, 136 L.Ed.2d 676 (1997)] (quoting Beszborn, supra, 21 F.3d at 66). In fact, one federal circuit court has noted that "[t]he task of establishing the requisite prejudice for a possible due process violation is `so heavy' that we have found only two cases since 1975 in which any circuit has upheld a due process claim [based on pre-indictment delay]." United States v. Huntley, 976 F.2d 1287, 1290 (9th Cir.1992) (citing United States v. Barket, 530 F.2d 189 (8th Cir.1976) and [Howell v. Barker, 904 F.2d 889 (4th Cir.), cert. denied, 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 595 (1990)]). Thus, in United States v. McGough, 510 F.2d 598, 604-05 (5th Cir.1975), the court held that "the death of some six potential defense witnesses" failed to "meet the clear requirement of [United States v. Marion, supra, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468] that actual *387 prejudice be shown" because defendant's assertions concerning the testimony these witnesses could have given was "speculative." Similarly, in Beszborn, supra, 21 F.3d at 66, the court concluded that the death of "five potentially material witnesses" as well as the loss of alleged exculpatory documents was insufficient to establish actual prejudice. See also United States v. Lovasco, supra, 431 U.S. at 789-90, 97 S.Ct. at 2048, 52 L.Ed.2d at 759; United States v. West, 58 F.3d 133, 136 (5th Cir.1995).
[Alexander, 310 N.J.Super. at 355-56, 708 A.2d 770.]
The Alexander court applied this "stringent standard" for actual prejudice to the facts. 310 N.J.Super. at 356, 708 A.2d 770. Defendant said he was prejudiced because he could not call his brother as a witness. Defendant claimed he was with his brother at the time of the crimes and his brother had died. Defendant also said that on numerous prior occasions he had used the phone on which critical fingerprints were found, but the phone company only maintained phone records for up to eighteen months. We said there was no actual prejudice because even if defendant had been indicted promptly, his brother still could not have testified because he died shortly after the offense occurred. We also said defendant's brother likely would not have remembered defendant's prior calls from the fingerprinted phone, and there was no "direct evidence" the phone records would have shown the prior calls. Id. at 356-57, 708 A.2d 770.
Alexander makes several important points. First, pre-indictment delays are not subject to the Sixth Amendment speedy trial standards, since those are only implicated post-arrest. Second, the relevant test is a two-pronged analysis from Aguirre, which requires a defendant to show (1) there was no legitimate reason for the delay and (2) defendant was prejudiced. Third, assuming defendant had established the first prong, there was no actual prejudice established in a two-year delay. One witness' death would not have affected an undelayed trial and there was no real proof that the telephone records, if available, would have supported defendant's theory.
In this case now before us, the judge essentially applied Alexander. The judge said he was "not prepared to make a determination that no prejudice exists." The judge's hesitation was rather on the first prong of whether there was a legitimate reason for the delay. As the judge phrased it, his concern was "whether [the State] was irresponsible or if it contributed to the delay in an unreasonable sense." On this issue the judge concluded that an indictment could have been returned against Townsend in 1981. Still, "the evidence at that time was such that the [State] could not reasonably anticipate conviction given the evidence it had."
The judge observed that two of the State's main witnesses, Jason and Brian Williams, were seven and three, respectively, when the crime occurred. In the judge's view, these witnesses "are now in a much better position to verbalize what they did and did not experience." The judge also said "the so-called dying declaration was such in 1981 as to permit a reasonably informed determination to be made by the prosecutor then, that it would be unwise for the prosecutor to move the case with the state of the evidence that then existed ... that declaration converted what would otherwise be a case more ripe for conviction to one less ripe for conviction, although in any circumstance, might have been sufficient to produce an indictment now." The judge recognized that there was no statute of limitations for murder. He stated:

*388 I am moved by the fact that no indictment was delivered in '81 or '82, and this matter was allowed to languish this far, but the fact of the matter is that discretionary efforts were made by the prosecutor at that time, and this time, are, I think under all of the circumstances laudable. They are not a great example of what, and I should say they are not what we would like to see under due process, but there are times when that can't be helped. This is one of those times. This is one of the times that for purposes of this decision and assuming that delay, that the reason for the delay is reasonable, and therefore ... the application of the defendant must fail.
The judge also cited State v. Cichetto, 144 N.J.Super. 236, 365 A.2d 207 (App.Div.1976). There, the defendant was not indicted until 1974 on charges of bribery, extortion, and other crimes that allegedly occurred in 1969. The trial judge dismissed the indictment based on federal speedy trial standards. We reversed. We held federal speedy trial standards did not apply because the case involved pre-arrest delay. 144 N.J.Super. at 237-38, 365 A.2d 207. Rather, we said:
The paramount issue in this case is whether there was a denial of defendant's right to due process under the Fourteenth Amendment because of an unreasonable delay between the commission of the crimes and presentment of the charges to a grand jury where there had been no prior criminal complaint or arrest.
At a hearing on a motion to dismiss an indictment on that ground, a defendant has the burden of establishing both that there was no legitimate reason for the delay and that he was prejudiced thereby. State v. Rodriguez, 112 N.J.Super. 513, 271 A.2d 905 (App.Div.1970). While the ultimate burden of persuasion on both issues rests upon defendant, the State is obligated to show that there was a legitimate reason for the delay once the defendant has shown prejudice to his case. State v. Roundtree, 118 N.J.Super. 22, 29, 285 A.2d 564 (App.Div.1971).
[Cichetto, 144 N.J.Super. at 238-39, 365 A.2d 207.]
We held defendant did not meet his burden of persuasion.
We must here determine (1) whether the trial judge used the proper test for a claim of undue delay between the criminal event and the leveling of the charges; and (2) whether the facts supported denial of the motion. We conclude that the trial judge used the right test and applied it correctly.
On the first issue, case law adequately supports Alexander as the proper test for a delay between the criminal event and arrest. The other two possible tests  the Cappadona four-part test and R. 3:25-3  do not fit the mold. As discussed in Alexander and Cichetto, the federal standards that form the basis of Cappadona's four-part test do not deal with pre-arrest delays. Alexander, 310 N.J.Super. at 352-53, 708 A.2d 770 (citing Lovasco, 431 U.S. at 788-89, 97 S.Ct. at 2048, 52 L.Ed.2d at 758). R. 3:25-3, which requires a judge to ask whether "there is an unreasonable delay in presenting the charge to a grand jury or in filing an accusation against a defendant who has been held to answer upon a complaint," does not work either. The language of R. 3:25-3 suggests it applies to delays after the defendant is detained. It applies to "an unreasonable delay in presenting the charge to a grand jury or in filing an accusation against a defendant who has been held to answer upon a complaint [.]" Id. (emphasis added). The use of "defendant" implies the person has already been arrested and charged, and the use of "has been held" *389 suggests the delay occurred while the person was in custody.
As noted, the trial judge turned his decision on the first prong. The State contended it had more mature witnesses. The State said it now had the testimony of a woman, then age thirteen in 1981, who would not testify because her mother would forbid her cooperation. The witness stated she saw defendant in his truck and he crashed through a gate, weakening the defense theory that Williams was killed by another vehicle, not a truck, coming through the gate. The State also said it now had the helpful statement of a neighbor whose residence adjoined Williams' residence. There also were additional statements of relatives detailing prior acts of domestic violence that would show motive under N.J.R.E. 404(b). The State demonstrated that this additional evidence was not a mere refinement of its available 1981 evidence, but included both additional relevant witnesses and corroborative testimony. To the State "the investigation needed to remain open to develop other witnesses" in part because "everyone was so petrified of defendant."
The State further argues persuasively there was no proven actual prejudice to defendant, but only vague assertions of lost witnesses, faded memories, and misplaced documents. Defendant argues there were lost witnesses, including police officers and a nurse, who might have heard Williams say she was hit by a car. Defendant also claimed other lost witnesses could have testified about the relationship between himself and Williams. Defendant also lamented the lack of N.J.R.E. 404(b) rebuttal evidence. Still, defendant did not explain persuasively why the State's conduct lacked legitimate justification, especially when this was a murder case.
In his appellate brief, defendant restates his arguments below on actual prejudice. He emphasizes that unlike other pre-arrest delay cases, the extenuating delay here was twenty years. He argues the State had all the evidence it needed in 1981 and the only reason for the delay was the State's inattention and lethargy. Defendant argues the only reason the State took action in 2001 was because the Williams brothers came forward on their own initiative. Defendant urges the State did not need to wait until 2001 for the case to develop, but could have indicted at some point between 1981 and 2001. Against the State's argument that witnesses were afraid to testify, defendant submits the State could have avoided that by arresting him and detaining him pending his indictment and trial. Defendant also observes the BWS evidence to combat the dying declaration was available in 1984 after State v. Kelly, 97 N.J. 178, 478 A.2d 364 (1984).
We agree with the State assertion that defendant's claims of actual prejudice with regard to the inability to call helpful witnesses are vague, if not fanciful and very speculative. As for Alexander's first prong, the State notes that no New Jersey court has explained whether "legitimate reason for delay" requires the defendant show the delay was intentional, a strategic maneuver. The State argues it could still satisfy the first prong if it were so defined. The State asserts convincingly that although it could have indicted in 1981, it could not reasonably have anticipated a conviction.
We agree that there might be extreme cases where due process could bar a long-delayed murder prosecution. For example, if a defendant showed that the State had sufficient evidence to indict for murder, but did not indict until the potential defendant's main exculpatory witness died, due process might be triggered. In such a situation, the defense could be entirely *390 eviscerated by the passage of time. However, that is not the case here. Although the State probably could have indicted defendant earlier, its delay did not violate the rigorous standards of Alexander.

IV
Defendant asserts the judge erred by admitting testimony concerning the alleged prior instances of violence by defendant directed against the victim. The scope of review of a trial judge's determination on the admissibility of other "bad conduct" evidence is narrow and deferential, limited to an "abuse of discretion" standard. State v. Marrero, 148 N.J. 469, 483, 691 A.2d 293 (1997) (citing, inter alia State v. Ramseur, 106 N.J. 123, 266, 524 A.2d 188 (1987) ("The trial court, because of its intimate knowledge of the case, is in the best position to engage in this balancing process. Its decisions are entitled to deference and are to be reviewed under an abuse of discretion standard.")).
N.J.R.E. 404 states:
Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes Evidence
* * *
b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
In State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992), the Supreme Court placed additional constraints on the admission of character evidence against an accused. Such evidence: (1) must be relevant to a material issue which is genuinely disputed; (2) the other conduct must be similar in kind to that which is charged currently and must have occurred reasonably close in time to the events at issue in the criminal trial; (3) evidence of the other conduct must be clear and convincing; and (4) its probative value must not be outweighed by prejudice to the defendant. See Biunno, Current N.J. Rules of Evidence, Comment 8 to N.J.R.E. 404(b) (Gann 2004) (citing Cofield; State v. Bakka, 176 N.J. 533, 547, 826 A.2d 604 (2003); State v. Darby, 174 N.J. 509, 519, 809 A.2d 138 (2002); State v. Hernandez, 170 N.J. 106, 119, 784 A.2d 1225 (2001); State v. Covell, 157 N.J. 554, 564, 725 A.2d 675 (1999); Marrero, 148 N.J. at 483, 691 A.2d 293).
Jason Williams, Brian Williams, and Freddie Williams all testified for the State. As noted, at the time of Williams' death, Jason was seven, Brian was three, and Freddie was fifteen. At that time, Brian and Jason lived with Williams and defendant (also nicknamed "Poncho") at 64 Bond Street in Trenton. Each said they saw defendant beat Williams on various earlier occasions. Jason and Brian testified that they saw the beating incident they said led to Williams' death.
Defendant argues that "other crimes, wrongs or bad acts" testimony from Jason, Brian, and Freddie violated N.J.R.E. 404(b). Jason talked about how defendant "would always beat on her." He said that once defendant pushed Williams through a glass window and allowed the broken glass to cut her. He said defendant would beat Williams with anything, including a two-by-four. He testified to another specific act of violence that occurred when defendant and Williams lived at a different location. Brian, four years Jason's junior, testified to an incident when defendant threw Williams through a Christmas tree.
*391 Freddie, age fifteen at Williams' death, gave more extensive bad acts testimony occurring when he lived with Williams in Trenton when defendant first dated her. Freddie said defendant hit his mother in the knee with a glass baby bottle, and another time hit her in the head with a new stereo. After this latter testimony the judge gave a N.J.R.E. 404(b) limiting instruction. The judge said the jury could only use the evidence "for a specific purpose, such as motive, or such as lack of mistake, or such as in this case, the allusion to the identity of who did and did not commit the offense." Freddie continued to testify that defendant would beat Williams "once or twice a week." He said defendant once tried to throw a TV at Williams and on another occasion tried to throw her out a window. He said on one Christmas defendant threw gifts out a window. Freddie testified about another instance when defendant punched his mother which led to a fight between himself and defendant. The trial judge gave another limiting instruction on Freddie's bad acts testimony at the end of his direct examination.
The scope of the bad acts testimony was decided at a pretrial hearing. After considering the expected testimony of Jason, Brian, and Freddie, and another witness Patricia Brevard, the trial judge said the first three could testify to prior bad acts but that Brevard, who offered to testify to defendant's slap of Williams while bowling in 1976, could not. The judge fully explained his reasoning in his pretrial ruling on October 3, 2002.
We agree with the judge's ruling on this point. The bad acts evidence was "highly probative of several issues in dispute  defendant's intent or purpose, his state of mind, his motive, the absence of mistake or accident, ..." The State properly relies on State v. Long, 173 N.J. 138, 162, 801 A.2d 221 (2002), for the proposition that evidence of a defendant's prior assaults on his victim is so highly probative of these issues that it is seldom excluded because of undue prejudice.
Our courts have frequently allowed other crimes evidence as a permissible evidence of motive, intent and state of mind. See e.g., State v. Ramseur, 106 N.J. 123, 266, 524 A.2d 188 (1987) (evidence of defendant's prior threats and violence towards victim admissible to show defendant's state of mind); State v. Baluch, 341 N.J.Super. 141, 191-92, 775 A.2d 127 (App.Div.2001) (prior physical abuse of victim); State v. Donohue, 2 N.J. 381, 388, 67 A.2d 152 (1949) (evidence of defendant's prior beatings of murder victim admissible to show defendant's state of mind); State v. Eatman, 340 N.J.Super. 295, 299-302, 774 A.2d 571 (App.Div.2001) (evidence of defendant's prior assaults of girlfriends, including homicide victim, admissible to show state of mind); State v. Angoy, 329 N.J.Super. 79, 85-88, 746 A.2d 1046 (App.Div.), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000) (evidence of defendant's prior choking of homicide victim admissible to show motive); State v. Ellis, 280 N.J.Super. 533, 546-47, 656 A.2d 25 (App.Div.1995) (evidence of history of defendant's abusive relationship with victim properly admitted to show motive, common plan, and intent); State v. T.C., 347 N.J.Super. 219, 231-36, 789 A.2d 173 (App.Div.2002) (evidence of defendant's earlier abuse of victim admissible to show intent); State v. M.L., 253 N.J.Super. 13, 22-25, 600 A.2d 1211 (App.Div.1991), certif. denied, 127 N.J. 560, 606 A.2d 371 (1992) (permitting testimony about other instances of abuse not charged in the indictment); State v. Frost, 242 N.J.Super. 601, 619-21, 577 A.2d 1282 (App.Div.1990) (prior assaults on victim).
*392 In her closing argument the prosecutor did not rely on the evidence of the prior bad acts at all; she certainly did not try to improperly arouse the jurors' emotions on this score. A limiting instruction, as given here, "helps to insure that the prosecutor does not use the motive evidence improperly during summation." State v. Long, 173 N.J. at 165, 801 A.2d 221.

V
The heart of the defense was the putative dying declaration that Williams made while in the intensive care unit. In the so-called declaration, Williams allegedly nodded to a detective that defendant did not cause her injuries but rather a car struck her.
Defendant argues that the trial judge should not have allowed the State to introduce BWS testimony to discredit Williams' dying declaration. Defendant asserts the judge's articulated basis for admitting the BWS evidence  to compensate the State because he admitted the dying declaration that, in his opinion, did not have a strong or even adequate foundation  was erroneous. In a subpoint, not raised below, defendant argues that the judge should have provided a special BWS instruction, especially because the State's expert, Dr. Kabus, could not conclusively testify Williams had BWS.
N.J.R.E. 804(b)(2) authorizes the introduction of a "dying declaration" as admissible hearsay. The rule states:
Statement under belief of imminent death. In a criminal proceeding, a statement made by a victim unavailable as a witness is admissible, if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death.
N.J.R.E. 804(a)(4) deems a declarant an "unavailable" witness when the declarant "is absent from the hearing because of death[.]" The rationale for admissibility is that a person in such circumstances would have no reason to lie. See Biunno, New Jersey Rules of Evidence, Comment 3 to N.J.R.E. 804 (Gann 2004). As described in 1789 in one of the earliest cases to apply the rule:
[T]hey are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone: when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn, and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a Court of Justice.
[Desmond Manderson, Et Lex Perpetua: Dying Declarations & Mozart's Requiem, 20 Cardozo L.Rev. 1621, 1622 (1999) (citing The King v. Woodcock 168 Eng. Rep. 352, 353 (Cr.Cas.Res.1789) (footnote omitted in article)).]
In this case, the testimony on the dying declaration came from Detective Pogorzelski. He started with the Trenton Police Department in April 1968 and retired in June 1994. When he arrived at the hospital, a doctor informed him that "it would be very hard for [Williams] to understand any of [Detective Pogorzelski's] questions, that because of her being in an intoxicated condition and being under medication." The detective approached Williams as she lay in the intensive care unit. He "told her she was in a very bad condition, things did not look good for her, and that she would have to talk to me." Williams "just laid there and kind of moaned."
Detective Pogorzelski then asked Williams if defendant beat her. She moved her head from side-to-side. The officer interpreted this as a "no." When he asked her if she was hit by a truck, she *393 made the same motion. When he asked her if she was hit by a car, "she went up and down with her head, [a] kind of motion telling me yes, that she was hit by a car." She could not verbalize her answers; she then became unresponsive. Detective Pogorzelski's testimony was consistent with his testimony at a pretrial evidentiary hearing on the declaration's admissibility.
During the evidentiary hearings, the parties debated whether Williams' responses to Detective Pogorzelski satisfied N.J.R.E. 804(b)(2). Defendant argued that Williams was aware of her impending death, and that her responses were voluntary and in good faith. Defendant said that since Williams knew to shake her head "no" to two questions and then nodded a "yes" to another question she understood the questions asked of her. The State argued Williams did not realize she was dying, and that her answers lacked credibility because she feared further abuse.
The judge observed this was an unusual situation because the defense sought to use a dying declaration as exculpatory evidence, not the State using it as incriminating evidence. The judge's initial impressions were:
This is a very close question because there is on one part-one-half the broader question of judicial fairness seems to require that that dying declaration be permitted, and on the other half, there are some structural weaknesses in the application of the rules which must be met to permit the declaration to be allowed.
The statements that are made are susceptible of at least three interpretations.
One, they were the truth, and this defendant is, of course, thereby wrongly charged.
Two, they were an effort to protect Walter Townsend, notwithstanding the fact that Walter Townsend applied the beating and eventually physical injuries that resulted in the death.
And three, the victim had no notion of what she was saying or doing, and we're interpreting Pogorzelski's interpretation of what he saw as what I called verbal acts. Each one of those three is almost susceptible under the circumstances to that conclusion, however, as I said, inasmuch as this evidence underpins so many things that happened in this case, the original redirecting of the ship of investigation piloted by the police department.
Two, the reaction to what he considered to be the legal consequence of a dying declaration by the defendant.
And three, the ultimate equities involved. [It] is this Court's opinion that it will side with the ultimate equities involved and permit the evidence of what is called the dying declaration despite the manifest interpretations that can be made ... I will permit the discussion relating to [BWS] as it had been described by the prosecutor in Court and what I understand the [BWS] to be permitted, to prove respecting the acts of a battered woman.
In response to the ruling, defendant's counsel expressed concern about the admission of the BWS testimony in conjunction with the dying declaration. After an N.J.R.E. 104 hearing on the testimony proposed from Dr. Kabus, the State's BWS expert, and Dr. Coughlin, the defendant's BWS expert, the judge ruled that if defendant wanted to introduce the dying declaration, he would allow the State to introduce BWS testimony.
During trial, but before Dr. Kabus testified, defense counsel requested an offer of proof from the State as to what the expert *394 would say. Even though under the earlier ruling any BWS testimony was admissible, both the judge and the prosecutor began to express reservations about the admissibility of the BWS evidence where Dr. Kabus could not conclude Williams actually had the BWS syndrome.
The State said it would introduce the "generalities of [BWS], without having [Dr. Kabus] opine as to Mrs. Williams herself." Defense counsel objected "because [the expert testimony] has to have some relationship to this case. If she is going to have Dr. Kabus get up there and talk about [BWS] and not in some way relate it to this case, I don't see the value of that. I see extreme prejudice because in effect what the prosecutor is asking the jury to do is ... to come to that conclusion." The judge found the prosecutor's proffer of BWS "generalities" a "little bit troublesome because you're going to argue to the jury, I would presume, that a connection should be made." The prosecutor admitted she was "concerned."
The judge suggested that the presentation of BWS testimony without an expert conclusion that Williams had BWS was like having one Christmas tree bulb on a Christmas tree. The prosecutor analogized the testimony to the use of a drug expert in a drug-distribution case. Near the end of the colloquy, the judge said:
I looked at the cases, and my concern is a general philosophical discussion about the [BWS] would be more problematic because if you're just saying you're going to lay those questions out and say what is a battered woman, what is [BWS] and then just leave it there, that strikes me as being more, shall we say, reviewable negatively by an ... Appellate Division court who probably never got deeply ensconced in the issue in the first place, and here we are, deeply ensconced in the issue.
In response to defense counsel's question, the judge stated the substance of his ruling:
MR. SOMERS [Defense counsel]: ... Your Honor, that is why I asked for this offer of proof, because ... if the prosecutor is going to talk about the generalities or her expert is going to talk about the generalities of the [BWS] and not make a connection to this case, then I don't see ...
THE COURT: You've already had the benefit of the fruit of the dying declaration. I mean, that was  remember, just for purposes of review, of the reviewing court, this could have been shaved either way as well.
Here is what ... I believed just so the Appellate Division, should it ever get to them, or the Supreme Court so they have a better understanding of my thinking; the dying declaration was a little bit short of being a dying declaration for a number of reasons, whether you have to infer that Nicky Williams was ... of a belief that she was going to die is the foundation upon which dying declarations are ... founded. Is the foundation of that, the permissibility of hearing a dying declaration because it is the feeling that if someone is going to die, they are not going to die with a lie on their lips.
Now, you take that one step further and you get into the sticky area of the [BWS] and you have a battered woman defending her assailant because, one, she is fearful of further assaults, she is depended upon the assaulter, her assailant, and reasons that speak to the ... motives of Nicky Williams to look into the future, under whatever delirium she might have been exposed to at that period in time, if she should happen to end up, and Poncho did do it, and she is going to live with Poncho with anticipation *395 of another beating, that is why ... the argument is a circular one with respect to the balance of the two, of the two issues.
I could have very easily [have] said there is insufficient proof that Nicky Williams believed that she was going to die, and cut out the dying declaration. But, I thought in fairness to Walter Townsend that that declaration was important, not only for the defense, but critical to the defense. That was my reasoning, and I believed, without being able to assess, as the prosecutor's often noted, a dead victim, we can't assess what her motives were. We can't get a full development as to whether she was a battered woman and whether she  whether the dying declaration was, at all was an appropriate circumstance if she should have survived.
There are a number of reasons that you might be able to argue that the dying declaration would still be permissible because it would still be with the anticipation of dying. You could argue either way on the dying declaration; anticipation of death or anticipation of life.
But, as I asked you earlier in the trial, when we weighed this the first time, went through the argument, you indicated, Mr. Somers, you wanted, you wanted it to be offered to the jury, and I think your decision was a correct one. In other words, you could have said you didn't want it in and it would foreclose other avenues, but it certainly operates in all fairness to Poncho, and that is why I permitted that to be let in.
Now, giving a little on that end, I thought it balances by permitting discussion about the [BWS] because that gives a subsidiary explanation to why, why a woman might do that. So, it is trying to give you both fairness.
And what I am encouraged by, shall I say, is that I'm obliged, as are all of the judges, to go to what we call the New Jersey Judicial College, and I've received the curriculum after I made this ruling earlier on in this case and now I'm being revisited, but there is a little course that I have indicated a desire to take and that would be trial evidence, artistry and advocacy in the courtroom. And it is given by somebody from Arizona. What they know about New Jersey law, whatever, I'm not sure. But this gentleman figures that there are three Rs for filtering evidence, to quickly scrutinize its admissibility, and he says, he asks three questions, is it relevant, is it reliable, and the last question is what compels me, is it right. Now, we can't tell whether it is right until ultimately another reviewing court makes the determination. It is like the umpire saying, is it a ball or a strike, and it is nothing until he calls it.
So whether we know that this is right, we won't know if, in fact, it ever goes to the Appellate Division and is considered, but I think the Appellate Division should understand that the motivation behind this was a balancing of the two equities of complicated evidentiary rulings that have, in my view, no foundation in the books. All the books, all the green books and all the cream books I have in my office I found nothing that really makes it clear that this is admissible or not admissible. Consequently, I have to rely on my experience as a trial lawyer, my experience as a trial judge, and the feeling that I have that it's right to do this. It is right to give it to the jury. I can't make that decision.
The judge added:
In other words, there is [a] rationale that the jury is entitled to consider in light of her testimony, there is a rationale *396 in the broadest sense for a statement that otherwise defies our credulity. Well, normally we would say, well, damn, the woman is on her death bed and she is exonerating the guy. Poncho didn't do it. She was hit by a car. She was hit by a truck. Well, this gives you a rational motivation to lie, and which apparently has been approved and accepted by a number of courts in New Jersey; one that seems to be within legitimate reasons, the bounds of reason.
So the jury is not going to make an expert opinion, they going to draw facts from, and draw inferences as circumstantial evidence oft times does, permit them to draw inference as to what facts existed. They can determine that that was a characteristic of a battered woman, whether it was  whether she was or not declared a battered woman, that is one of the characteristics that are out there, and that is the rationale behind this reasoning.
The next day, the judge amplified his ruling, citing N.J.R.E. 702. He said,
It seems to me that a jury can appropriately benefit by the testimony, it will be helpful to the trier of fact, it will assist the trier of fact to understand the evidence or determine a fact in issue, and therefore, the testimony ofa  of the proposed expert who has been deemed an expert by other courts in this state, seems to be appropriate, that they can take what has been a relatively new field of expertise but that has received a lot of attention because of a variety of reasons that we need not go into, but that battered women and [BWS] are a more  a higher focal point in the panorama of specialized circumstances that afflict the variety of victims that we have in this day and age.
Accordingly, it would seem to me that it is appropriate that the jury should be assisted in understanding the concept that has been, I believe, dealt with approbation by our Supreme Court and that provides yet another foundation for the testimony I've permitted, and I just wanted to make it a little more, a little more clear, although it was not referred to by anybody in particular in this court, it seems to me to be quite, quite clear that that could be offered and assessed by the jury.
It is not unlike the analogy that the prosecutor brought in about a broad assessment of drug circumstances that are not necessarily directly applicable to the case wherein such testimony is heard, but nevertheless, it is testimony that is helpful to a jury, and for that reason, I can agree with what the prosecutor has said and the testimony again, will be admitted for the purposes described by this Court.
Immediately before Dr. Kabus testified for the State, defense counsel renewed his objection, stating:
I object to Dr. Kabus coming in and testifying. I learned from the Prosecutor that Dr. Kabus is going to come in and testify to characteristics of the [BWS] in general, and, your Honor, what I'm saying is that her mere presence talking about [BWS], she in effect, even if she doesn't talk about this particular case, she is in fact rendering a net opinion, because this jury will wonder why in the world is she here. I mean why she's giving this opinion about battered women, and by implication, that must apply to Norma Williams.
To this the judge responded, in part:
[I]t should be made clear that there are a number of competing concerns, and those concerns include the fact that there is testimony which suggests that the victim was the subject of a number of attacks by the defendant, and that is *397 our 404(b) testimony. That testimony is related in my view to an appropriate introduction under 404(b), but also relates to the declaration that Nicky Williams made on a prior dying, half an hour before she died or 20 minutes before she died, which effectually exonerated the defendant, if we can determine as a matter of fact that that testimony does do that. We have relatively abstruse testimony, I would say with respect to Detective Pogorzelski's final confrontation with the victim. And as I said, in my view, within this Court's discretion, I could have discounted that as a dying declaration because there was not any evidence necessarily that could be determined to suggest an awareness on the part of Nicky Williams that she was about to die, thereby making the dying declaration, meeting one of the elements of a dying declaration.
However, and as a matter of fact, if one is going to understand her comments in the context in which they were given, and I say comments as loosely as I possibly can, because they involve a groan, whether it was conscious or unconscious, it involves questions of whether she understood what she was saying, what she was doing, what she was hearing, whether the shakes of the head and the nods of the head were interpreted correctly by the detective are all matters that ultimately have to be resolved by this jury. That was introduced, despite the fact that I felt that it could have easily been declared to fall short of those requirements needed to involve a dying declaration, but I figured further, this Court figured that in the interest of fairness to the defendant, and in interest and response to your request and Mr. Townsend's request, that they be introduced, and obviously, you have to argue that those are important considerations for the jury to respond to, they are appropriately counter-balanced by the introduction of what, if it is determined to be exculpation in a dying declaration, there  as equally it can be determined that it is part of what would normally be considered or a characteristic of what may normally be considered a dying  a[BWS] or battered women's response to years of battery, and that would be the protection of the person who is her batterer and assailant. And that, once again, is compounded by the fact that it goes to the dying declaration as to whether, if she exonerated the defendant inappropriately, again, the question for the jury, that that goes against the declaration of an  that the declaration can be considered dying declaration for purposes of the hearsay rules and the testimony disallowing such hearsay.
Consequently, it comes down to a question of what is the most right under all of the considerations, and those considerations this Court has balanced, and any reviewer of these decisions should understand that in the broadest sense it was felt by this Court that it would be  although without any prior guidance from any courts, it was felt that it was the right thing to do, given the interpretation that could be accorded the dying declaration, taken into account with what could effect that dying declaration.
Consequently, the Court denies the application to once again disallow it, because it seems to this Court to be most correct under all of the circumstances, of the totality of the circumstances that it be permitted under 702, which permits testimony that is helpful to the trier of fact.
In sum, the trial judge adopted an equitable balancing justification for admitting the BWS testimony, despite the fact that Dr. Kabus could not say Williams had a BWS diagnosis. The first justification *398 was that he was previously indulgent to the defense when he admitted the dying declaration testimony. A second justification was that it was useful "general information" evidence, and thus helpful to the trier of fact under N.J.R.E. 702. A third was that this testimony combined with N.J.R.E. 404(b) testimony on defendant's prior acts of abuse to give added context to the dying declaration.
After this ruling, Dr. Kabus and the defense's expert, Dr. Coughlin, testified about BWS. Dr. Kabus was qualified as an expert "in battered women and [BWS]" and "to testify with respect to [BWS] as an adjunct to or part of Post Traumatic Stress Disorder." Both experts distinguished between a battered woman and a woman with BWS. To have BWS, a woman must exhibit five of eight BWS characteristics. But a woman who does not meet five of the eight BWS characteristics might still be "battered." Dr. Kabus agreed that the difference is a matter of degree. Dr. Coughlin did not fully agree.
Dr. Kabus testified that a common trait of women with BWS  lying to protect the abuser for fear of future abuse  can also be present in women who are battered but who do not have BWS. By contrast, Dr. Coughlin said that just because a woman is battered does not mean an expert can predict what her behavior will be. Instead, "`predict behavior' has more to do with me for what kind of treatment I need to provide for the person, what's likely to happen in our treatment, what supports do I need to provide for the person." Although Dr. Coughlin agreed there are commonalities in behavior between battered women and women with BWS, he said there was no extant research to support the presence of lying as a protective device in both BWS women and non-BWS battered women. While clinically he had seen both BWS women and non-BWS battered women who lie to protect abusers, no research supported this as a characteristic in both.
On appeal, defendant contests the use of Dr. Kabus to testify on BWS. Defendant argues that it was erroneous for the judge to adopt the "rough justice" solution that allowed the admission of the dying declaration only if the State could present BWS testimony. As defendant states, "[A] perceived weakness in the foundation for an aspect of one party's case  and the defendant vehemently maintains that no such weakness exists  cannot provide the basis for permitting countervailing evidence in the absence of a factual basis or legal authority for it." Such a perception of weakness in the foundation of the dying declaration "does not constitute authorization for the court to disregard the rules of evidence in order to permit the State to neutralize that declaration." Further, defendant contends "our case law has not authorized expert testimony concerning purportedly typical characteristics and responses of battered woman. Rather, it has authorized such testimony concerning sufferers of the Battered Women's Syndrome." Defendant urges that "no inferences may be appropriately drawn on the basis of the Syndrome in the absence of a diagnosis that the woman in question suffers from it."
In response, the State contends the BWS testimony was appropriately admitted because it was relevant under N.J.R.E. 702. The State asserts there was no error in admitting the BWS testimony without a conclusion that Williams had BWS, based on cases in this State and from other jurisdictions. The State also claims that even if defendant's position is meritorious, the error is harmless.
This court said in State v. Ellis, 280 N.J.Super. 533, 656 A.2d 25 (App.Div. *399 1995), where Dr. Kabus also testified on BWS:
The use of expert testimony to establish Battered Woman's Syndrome has been permitted in New Jersey for over a decade. State v. Kelly, 97 N.J. 178, 209, 478 A.2d 364 (1984). The Court more recently restated the rationale for allowing such testimony as follows:
[E]xpert scientific evidence concerning "battered-woman's syndrome" does not aid a jury in determining whether a defendant had or had not behaved in a given manner on a particular occasion; rather, the evidence enables the jury to overcome common myths or misconceptions that a woman who had been the victim of battering would have surely left the batterer. Thus, the evidence helps the jury to understand the battered woman's state of mind.
[State v. J.Q., 130 N.J. 554, 574, 617 A.2d 1196 (1993).]
Thus, there is no question that expert testimony concerning the Battered Woman's Syndrome can be introduced in a criminal proceeding. But its application is limited to explaining a victim's reactions or late reporting of the events and not as evidence that the crime occurred. Ibid. See also State v. Frost, 242 N.J.Super. 601, 613-614, 577 A.2d 1282 (App.Div.) certif. denied, 127 N.J. 321, 604 A.2d 596 (1990) (evidence of Battered Woman's Syndrome can be used to bolster a victim's credibility in the State's case in chief). This use is similar to proof of a fresh complaint in a sexual assault case. See State v. Hill, 121 N.J. 150, 578 A.2d 370 (1990).
[Ellis, 280 N.J.Super. at 543-544, 656 A.2d 25 (emphasis supplied).]
In Kelly, the Supreme Court allowed a woman charged with murder to introduce BWS testimony to support her credibility. In Frost, we extended the permissible uses of such testimony to the State's use to support a female victim's credibility. 242 N.J.Super. at 612-613, 577 A.2d 1282. In Frost we said:
"[T]here is nothing about the testimony itself which makes it inappropriate for admission as part of the State's case in chief where the woman eventually asserts herself and reports her abuser to the authorities, before she becomes the defendant on trial for committing murder ... It would seem anomalous to allow a battered woman, where she is a criminal defendant, to offer this type of expert testimony in order to help the jury understand the actions she took, yet deny her that same opportunity when she is the complaining witness and/or victim and her abuser is the criminal defendant."
[Id. at 612, 577 A.2d 1282.]
Aside from the various justifications used before and at trial for admission of the expert testimony, all expert testimony must meet the requirements of N.J.R.E. 702 and 703. The judge relied on N.J.R.E. 702 to say that the BWS testimony would be helpful to the trier of fact. That may have been so, but this does not end the inquiry. Expert testimony must satisfy N.J.R.E. 703, which states:
Bases of Opinion Testimony by Experts. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
The judge rationalized the expert BWS testimony as "general information" evidence akin to a detective's expert testimony *400 on drug distribution. But ultimately, Dr. Kabus was asked about her opinions on the characteristics of non-BWS battered women.
Specifically, the State sought to elicit Dr. Kabus' opinion that non-BWS battered women, like women with BWS, are likely to lie to protect their abusers. Of course, the State wanted this testimony to discredit Williams' dying declaration. Within that opinion are several sub-opinions, including the opinions that non-BWS battered women are a discrete analytical category, that characteristics of non-BWS battered women resemble the characteristics of women with BWS, and that lying to protect abusers is one overlapping characteristic. All of these statements are not just "general information" but discrete expert opinions. As such, they are subject to N.J.R.E. 703. Under N.J.R.E. 703, they had to be based on sufficient facts or data, either made known to the expert before trial or of the type reasonably relied upon in the field. The State did not make such a demonstration. The following passage demonstrates the lack of an N.J.R.E. 703 grounding:
MS. LACKEN [Prosecutor]: You described the characteristics of the [BWS], but there are also common behaviors that are exhibited by women that either are either battered and/or suffer from the [BWS], correct?
DR. KABUS: Correct.
This was a "net" opinion. There is no elaboration on the underlying facts or data that support this proposition. Another example:
MS. LACKEN: One of the things that you mentioned was the ability to live with a Jekyll/Hyde personality, correct?
DR. KABUS: Yes.
MS. LACKEN: Now, would that be something that was consistent with individuals that are battered women without being a clinical, clinically diagnosed with the [BWS]?
DR. KABUS: Yes, that would be true.
MS. LACKEN: It seems that a lot of the characteristics that battered women suffer overlap into the [BWS] and vice-versa?
DR. KABUS: Definitely.
Again, these are "net" opinions, introduced over defense counsel's earlier objections to the BWS testimony. Eventually they became an important part of the prosecutor's summation to discredit the dying declaration when she argued to the jury:
And if you think [Norma Williams] was lucid, ladies and gentlemen, if you think she could hear and could understand, then you've got to assess the testimony of Dr. Kabus. Women who are battered lie to protect not only their batterers, but themselves from future beatings, from future abuse.
The State did not use Dr. Kabus' testimony for general information, but for her specific opinion that non-BWS battered women act like women with BWS, and a common characteristic of both is that they lie to protect abusers.
We conclude that the admission of the victim's dying declaration was not sufficient to justify admission of the BWS expert testimony. Nowhere in the rules of evidence does admissibility hinge on the judge's prior liberality in admitting evidence favorable to the opposing side. The "keystone of the Rules of Evidence," N.J.R.E. 402, says "[e]xcept as otherwise provided in these rules or by law, all relevant evidence is admissible." See Biunno, New Jersey Rules of Evidence, Comment 1 to N.J.R.E. 402 (citing Reinhart v. E.I. Dupont De Nemours, 147 N.J. 156, 164, 685 A.2d 1301 (1996) (quoting State v. Dixon, 125 N.J. 223, 248, 593 A.2d 266 (1991) (dealing with prior Evidence R. 7(f)))). That is, for evidence to be admissible, it *401 must be relevant and not excluded by other rules. Prior liberality is not an exception to the rule of admissibility, especially in a criminal case.
In this case, the BWS testimony should have been relevant and should have satisfied N.J.R.E. 703 standards. Dr. Kabus's statements that non-BWS battered women exhibit similar characteristics to women with BWS, such as lying to protect abusers, were net opinions. Their admission was potentially highly prejudicial, tending to discredit the linchpin of the defense case. While Dr. Coughlin did testify that no research has demonstrated commonality between non-BWS battered women and women with BWS, this does not cure or offset the inevitable prejudice occasioned by Dr. Kabus's testimony. Our rules choose exclusion, not cross-examination, as the safeguard against prejudice. The State had other ways to attack the dying declaration. There was the suggestion that Williams was both intoxicated and highly medicated at the time of the statement. The State could have pursued these grounds, as was its right under N.J.R.E. 806 (attacking and supporting credibility of hearsay declarant). We reverse because the basis of Dr. Kobus testimony did not satisfy the grounds for admissibility. We cannot permit the jury to draw an expert conclusion from evidence where the State's expert could not.
Although not raised at trial, we find defendant's related argument on the lack of a BWS expert-testimony jury instruction satisfies the plain error standard, R. 2:10-2. This provides an additional basis to reverse. The judge gave the standard charge for experts. See Model Criminal Jury Charge: Expert Testimony. There was no mention of the special characteristics of BWS testimony in the jury charge. Because defense counsel did not submit a request to charge, R. 1:8-7, or otherwise object to the charge, this alleged error requires reversal only if clearly capable of producing an unjust result. R. 1:7-2; R. 2:10-2. We conclude it had that potential.
In Ellis, we held that the absence of a special jury instruction on BWS was plain error. We there discussed the limited uses of BWS evidence  to overcome the myth that a battered woman necessarily would leave her abuser  and then said:
In the case before us, Dr. Kabus testified, based on what she was told by L.N., including all of the acts of abuse defendant allegedly inflicted on L.N. over the years, that the victim's failure to attempt an escape from defendant during the period of the abduction was consistent with someone who is suffering from Battered Woman's Syndrome. However, the court did not instruct the jury on the limited use of Dr. Kabus' testimony. The only instruction the judge gave the jury relating to Dr. Kabus concerned assessing her credibility.
[Ellis, 280 N.J.Super. at 544, 656 A.2d 25.]
We compared Ellis to Judge Pressler's decision in State v. W.L., 278 N.J.Super. 295, 650 A.2d 1035 (App.Div.1995), where we held that the trial judge's failure to provide a limiting instruction on Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence was reversible error. The Ellis court continued:
Similarly, the trial court erred in this case by failing to give the jury limiting instructions on the difference between substantive use and limited use of Dr. Kabus' testimony. The omission of limiting instructions was plain error since the jury certainly could have taken her *402 testimony as evidence of defendant's guilt rather than the victim's credibility. Accordingly, this error was "clearly capable of producing an unjust result," and reversal and remand is warranted.
[Ellis, 280 N.J.Super. at 545, 656 A.2d 25.]
If it was reversible error in Ellis not to give a jury instruction on BWS explaining that testimony's limited use where the subject was diagnosed with BWS, we conclude there is stronger reason to require a special instruction in this case. Here, the trial judge said he would admit the evidence only as "general information" and wanted to avoid jury speculation that Williams had BWS. Under the teaching of Ellis, a specific jury instruction was necessary at minimum to explain the limited purposes for which the State could use the BWS testimony and to point out that Williams was not diagnosed with BWS. In its brief, the State suggests the requirement of a jury instruction depends on the alternative factual context of cases in which BWS evidence is used. However, the thrust of the BWS case authority is that this expert testimony is "limited use" testimony, and that point must be made clear to the jury. Otherwise, there is substantial potential for misuse.
Reversed.